IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD YOUNG,                              :
                                            :
            Plaintiff                       :
                                            :        NO. 3:CV-07-016
      v.                                    :
                                            :        JUDGE VANASKIE
JAMES GRACE, Superintendent                 :
of SCI-Huntington, et al.,                  :
                                            :
            Defendants                      :

MEMORANDUM

Petitioner Richard Young, an inmate currently confined at the State Correctional

Institution at Huntingdon, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254, asserting twelve claims for relief in 186 numbered paragraphs.  (Dkt. Entry 1.)

Petitioner asserts that his 2003 first degree murder conviction is unconstitutional based on

numerous errors.  Respondents have filed a Motion to Dismiss the habeas corpus petition.

(Dkt. Entry 11, at 2.)  Because it does not plainly appear that Petitioner is not entitled to

relief, Respondents′ Motion to Dismiss will be denied.

I. Background

      A. Factual Background

      The following background has been extracted from the Habeas Petition.  On April 14,

1979, two trout fisherman discovered the body of Russell Loomis on a wooded

mountainside.  (Dkt. Entry 1, at ¶ 14.)  Loomis had been shot to death and it was the

prosecution's theory that Richard Young, William Slick, George Cornell, and Ronald Hull

had lured Loomis to the area on April 11, 1979, and shot him to prevent him from testifying

before a grand jury investigating fraud charges against Young and others.  (Id.)  A shovel

and a come-a-long found near the body were the only pieces of physical evidence taken

from the scene – no tracks, footprints, or other physical evidence were preserved.  (Id. at ¶

17.)

   At the time, Richard Young owned numerous businesses, including John's

Liquidations and John's Automotive; these businesses were the subject of a federal white-

collar investigation.  (Id. at ¶ 18.)  Retired FBI Agent Daniel Glasgow "testified that in the fall

of 1978 he received a complaint concerning Richard Young's business practices from a

man who did not get paid by a business called Brown's Wholesale."  (Id. at ¶ 23.)

Glasgow's investigation allegedly revealed that Brown's Wholesale was part of a "bust out"

scheme involving Joseph Brizinski, Hull, Young, Cornell, and "hundreds" of other suppliers.

(Id.)  The scheme involved the setting up of fraudulent lines of credit at various trade shows

for ordering merchandise that the participants had no intention to pay for. (Id. at ¶ 24.)  In

April 1979, Loomis was allegedly scheduled to appear before a federal grand jury in

connection with the "bust out" scheme.  (Id.)

   The "bust out" scheme claims were allegedly corroborated by Loomis' girlfriend,

Theresa Slick Hoffman.  (Id. at ¶ 26.)  As a result of hypnosis, Hoffman was able to testify

that Loomis had told her that Young had faked a burglary at his store, that Young had

allegedly planned to set a fire at Brown's Wholesale Liquidation Center, and that on April

11, 1979, Loomis called and told her he was going with Young to retrieve a Jeep that was

stuck in some mud.  (Id. at ¶ 27.)  The prosecution, over defense objection, also offered

evidence from several witnesses that at "some time prior to his death, Loomis had told them

about his plan to get a Jeep that was stuck in the mud someplace," and Loomis' fear that

"Young might harm his family."  (Id. at ¶ 31.)

Petitioner asserts that the testimony of Ronald Hull was the only evidence that

directly connected him to the murder.  (Id. at ¶ 18.)  Hull worked with the Petitioner in his

businesses, and testified that "a few weeks prior to the offense, he participated in a

conversation between Richard Young and George Cornell concerning their belief that

Russell Loomis was planning to cooperate with federal investigators."  (Id. at ¶ 19.)  Hull

claimed that Petitioner, George Cornell, Russell Loomis, and he "drove into the woods off

Aston Mountain Road in Loomis' Ford LTD to retrieve a Jeep that was stuck in the mud on

the mountainside."  (Id.)  Hull claimed that the men parked the Ford fifty (50) yards from

where Loomis' body was eventually found.  (Id.)  The men walked into the woods and

passed an old foundation, which Hull claims Cornell identified as Loomis' "grave."  (Id.)  As

Loomis crossed a stream, Hull claims that Young took out a handgun and fired two-to-three

times at Loomis' back, at which point, Loomis turned and started towards the others, yelling

3

and cursing, and Cornell grabbed the gun and fired three more times until Loomis collapsed on a log with one leg extended into the creek. (Id.)

Hull alleged that he, Young, and William Slick were unable to pull the body from the creek, and therefore left it and returned to the vehicles. (Id. at ¶ 20.) Slick, Young, and Cornell allegedly left in the Jeep and met on the road to do some repairs, and Hull drove Loomis' Ford to the Wyoming Valley Mall, where he abandoned it. (Id.)

During the course of the homicide trial, Dr. Robert Catherman, a forensic pathologist, "concluded that based on his autopsy, as well as the photographs and reports of the initial autopsy, Loomis could not have behaved as Hull had claimed." (Id. at ¶ 43.) Dr. Catherman stated that "the bullet that fractured, but did not displace, two thoracic vertebrae, would have had a concussive effect rendering the individual almost immediately paralyzed," which is in contrast to Hull's statement that Loomis ran along a log towards the shooter. (Id.) Moreover, the autopsy concluded that the bullet damaged Loomis' trachea in such a way that it would have made it impossible for him to scream as described by Hull. This evidence was rebutted by the prosecution through testimony of pathologist Isidore Mihalakis, who agreed that Loomis would not have been able to shout, but disagreed with the conclusion that paralysis would have resulted. (Id. at ¶ 43 n.13.)

It was also Catherman's opinion that "Russell Loomis was dead no more than 12 hours when his body was found on April 14, 1979." (Id.) Therefore, the April 11, 1979,

time of death was arguably incorrect.  The defense additionally presented experts who

testified that: (a) the April 11, 1979, time of death was wrong because there was no insect

infestation of the body; (b) soil samples taken from the bottom of Loomis' Ford could not

have come from the same mountain his body was found on; (c) Loomis' Ford could not

have maneuvered in the remote area described by Hull; and (d) the trajectory of Loomis'

wounds did not indicate that the shooter was directly behind Loomis as Hull testified.  (Id. at

¶¶ 44 - 46.)

In addition to the testimony of Hull, the prosecution presented the testimony of

Harold Litts, who resided at the base of the mountain where Loomis' body was found.  (Id.

at ¶ 28.)  Litts testified that on the evening of April 11, 1979, between 7:30 p.m. and 8:00

p.m., he and his brother heard noises that sounded like a woman screaming and fireworks;

about a half hour later, Litts' brother, Gary, saw a car parked near their gas storage and saw

a truck pull up and then leave.  (Id. at ¶ 28.)  The brothers, concerned about gas theft, got

into their mother's vehicle and drove past the parked car.  (Id.)  The parked car was jacked

up, the trunk was open, the trunk light was on, and men stood by the trunk.  (Id.)  After

driving past the parked car, the brothers turned the car around and, as they drove back, one

of the men stepped in front of the vehicle, and Litts was forced to drive around him.  (Id. at ¶

29.)  When later describing the man to police, Litts stated that he was "large, like a body

builder (6'2" or more and weighing over 250 lbs.), but could provide no description of the

other man at the car, other than to say that he was also large in nature." (Id.)

Six years later, in 1985, Litts was shown a photo array that included nine (9)

photographs.  (Id. at ¶ 30.)  Of the nine photographs, two pictures were of Young, and there

were pictures of Slick, Cornell, Hull, Loomis, and three others.  Hull identified the picture of

Slick as the man who had stepped in front of the car, but made no further identification.

(Id.)  During the course of the next seven (7) years, numerous photographs of Young were

published in the local media and in February 1999, nearly thirteen (13) years after the

homicide, Litts, his brother, and his attorney, met with state troopers and reviewed a second

photo array, which "included five of the original nine photos, including the same two pictures

of Young." (Id.)  The photograph of Slick and one of the photographs of Young was a mug

shot with tape on it.  (Id.)  After leaving the room to discuss matters with his attorney, Litts

returned and identified the mug shot of Young as the man who had been standing by the

car trunk thirteen (13) years earlier.  (Id.)  Litts' brother, Gary, who had been in the vehicle

with Litts the entire time, never made an identification.  (Id.)

It was the prosecution's theory that Loomis' homicide was the result of his

cooperation with federal agents regarding Young's business practices.  Thus, the

prosecution's witnesses were permitted to introduce evidence of Mr. Young's "bust out"

scheme at trial.  (Id. at ¶ 22.)  The prosecution presented Andrew Halupke, a member of the

"bust out" scheme, as a witness, but Halupke could not remember, even after attempts to

refresh his recollection, the details of statements he made to the police in February of 1981.

(Id. at ¶ 32.)  Thus, over defense objection, the prosecution was permitted to read the police

statement into evidence, and the jury heard Halupke's account that Young had advised him

not to testify in front of a grand jury, and that "Young had told Cornell not to worry, that they

would get Loomis." (Id.)  Moreover, the police statement revealed that Halupke, Young, and

Ron Hull "spent several hours driving around the area, looking for a place to bury the body."

(Id.)  Halupke also testified that "at the time he made the statement in 1981, he had been

under a lot of pressure from the police, who suggested to him that they would be interested

in hearing about a search for grave sites." (Id.)

In addition to the testimony of Halupke, Hull, and Litts, the prosecution presented

other significant evidence to support the theory of guilt.  Over defense objection, "[t]he

prosecution asserted that, in 1980, Richard Young left Pennsylvania and, under the name of

Todd Devine, moved to Boise, Idaho, where he lived until he was apprehended in 1988."

(Id. at ¶ 34.)  The prosecution used this evidence of flight as an inference of guilt in the

homicide.  (Id.)  A state police fingerprint expert was also allowed to testify that one of

Young's fingerprint cards, under the name of Todd Devine, showed scarring, as if in attempt

to obscure identity, which, the expert stated, is only attempted in murder cases.  (Id. at ¶

35.)

As evidence of consciousness of guilt, the prosecution presented William Gabriel

7

(over defense objection), to testify that while incarcerated in Lackawanna County Prison, Young told him that he was able to avoid the death penalty in 1995 "because the guy he killed never was actually in Court against him." (Id. at ¶ 36.) Christopher Cornell, whose father, George Cornell, was also allegedly involved in the homicide, testified (over defense objection) that while he was in jail with his father and Young, Young stated to his father "that he is not going – is he (sic) not sinking with this ship alone." (Id. at ¶ 37.) To further support the prosecution's theory, two retired Troopers, who had spoken to Young in 1979 and 1980 but never followed up, were allowed to read from their police reports over defense objection. (Id. at ¶ 39.) Two other witnesses were additionally called by the prosecution and testified that Young had tried to persuade them to testify falsely regarding seeing Loomis alive after April 11, 1979. (Id. at ¶¶ 40 - 41.)

B. Procedural Background

Petitioner was charged with first and third degree murder and in 1995 was tried with co-Defendant William Slick before the Honorable Jay W. Myers. (Dkt. Entry 1, at ¶ 2.) A jury found him guilty of first degree murder and sentenced him to death. (Id.) The Pennsylvania Supreme Court reversed and remanded. Commonwealth v. Young, 748 A.2d 166 (Pa. 1999). A retrial was held in the Lackawanna County Court of Common Pleas before the Honorable Forrest G. Schaeffer, from June 23, 2003, through July 11, 2003. (Id.) Petitioner was tried by a jury, convicted of first degree murder, and immediately sentenced

to life imprisonment.  (Id. at ¶ 3.)

Post-sentence motions were filed on July 16, 2003, and supplemental post-sentence motions were filed on October 9, 2003.  (Id. at ¶ 4.)  Petitioner's post-sentence motions were denied on December 13, 2003, and a timely notice of appeal was taken on January 8, 2004.  (Id. at ¶ 6.)  Petitioner's supplemental post-sentence motions were denied on January 13, 2004.  (Id. at ¶ 7.)  "Petitioner filed a Statement of Matters Complained Of on Appeal on January 27, 2004, and a Supplemental Statement of Matters Complained Of on Appeal on January 28, 2004."  (Id.)  The Lackawanna County Court of Common Pleas filed its Rule 1925(a) Opinion on May 10, 2004.  (Id.)

On February 7, 2005, the Superior Court issued a Memorandum Opinion dismissing Petitioner's claims and affirming the conviction.  Commonwealth v. Young, 873 A.2d 773 (Pa. Super. 2005)).  Petitioner filed a timely Petition for Allowance to Appeal to the Supreme Court of Pennsylvania, which was denied on September 21, 2005.  (Id. at ¶ 9 (citing Commonwealth v. Young, 885 A.2d 42 (Pa. 2005)).)  Petitioner's timely Petition for Writ of Certiorari to the United States Supreme Court was denied on April 17, 2006.  Young v. Pennsylvania, 126 S.Ct. 1794 (2006).

The current Habeas Petition was filed pro se on January 4, 2007, with requests to proceed in forma pauperis and for appointment of counsel.  (Dkt. Entry 2).  Petitioner's requests were granted on January 17, 2007, and he is currently represented by counsel.

(Dkt. Entry 6.)  Respondents were directed to reply to the Petition on January 17, 2007.

(Id.)  On January 30, 2007, Respondents filed a Motion to Dismiss the Petition for Writ of

Habeas Corpus.  (Dkt. Entry 11.)  The matter has been briefed and is ripe for review.[1]

II. Standard of Review

The Rules Governing Section 2254 Cases "permit a district court to dismiss

summarily a first petition [for writ of habeas corpus] without waiting for the State's response

if 'it plainly appears from the face of the petition and any exhibits annexed to it that the

petitioner is not entitled to relief.'"  Lonchar v. Thomas, 517 U.S. 314, 325 (1996) (quoting

Rules Governing Section 2254 Cases, Rule 4).  "Moreover, even if the petition cannot be

dismissed under that standard, the district court is still authorized to 'take such other action

as the judge deems appropriate.'"  Id.

A court may only grant dismissal if the complaint lacks sufficient factual allegations,

as petitioner must "satisfy the requirement that [they] provide not only 'fair notice,' but also

the 'grounds' on which the claim rests."  Phillips v. County of Allegheny, 515 F.3d 224, 232

(3d Cir. 2008).  In order to escape instant dismissal under Rule 4 of the Rules Governing

---

[1] At the time that they filed their motion to dismiss, Respondents requested and received permission to defer answering the Habeas Petition until after disposition of the motion to dismiss.  After responding to the motion to dismiss, Petitioner's counsel filed a comprehensive brief in support of his claims.   Respondents filed an opposition brief, and petitioner's counsel filed a traverse.  This decision concerns only the motion to dismiss and does not address the merits of Petitioner's claims. Nor does it deal with such matters as exhaustion of state court remedies or the proper standard of review.

Section 2254 Cases, the petition need not "show to a certainty or even to a probability that a constitutional violation has occurred; it is sufficient that facts pleaded 'point to a real possibility of constitutional error,'" and "when the petition presents such a possibility, the district court should not dismiss without requiring a response from the respondent or taking other action to allow development of the record." Cuadra v. Sullivan, 837 F.2d 56, 59 (2d Cir. 1988).  The court "must accept the well-pleaded facts as they appear in the writ of habeas corpus petition and extend the petitioners every reasonable inference in their favor." Khalid v. Bush, 355 F. Supp. 2d 311, 317 (D. D.C. 2005), decision vacated on other grounds by, Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007).  "Stated simply, the petitioners must establish at least one viable legal theory, accepting the facts as they plead them to be true, under which [a court] could issue a writ of habeas corpus challenging the legality of their detention." Id.  Courts can dismiss a habeas corpus petition only if it appears from the face of the petition that the petitioner is not entitled to relief. Lonchar v. Thomas, 517 U.S. 314, 320 (1996).

IV. Discussion

Petitioner asserts that "all of his claims were fairly presented to the State courts" and were therefore exhausted.  (Dkt. Entry 1, at ¶ 47.)  Moreover, Petitioner provides citations throughout his Petition to the place and manner of presentation of each claim in the state courts, and facts and case law to support each claim.  (Id.)  Respondents do not contend

that summary dismissal of the Habeas Petition is warranted on exhaustion grounds, although they do not necessarily concede that all claims have been fairly presented to the state courts.  Instead, they assert that the state courts' decisions were not contrary to firmly established law, and not based on an unreasonable determination of the facts.

Whether the state court rulings withstand review , however, cannot be decided solely on the basis of the bare averments or the petition and a motion to dismiss.  The sufficiency of the state courts' adjudication of a claim and whether it was contrary to firmly established law are questions which require an analysis of the state court record.  See Lonchar, 517 U.S. at 325.

Respondents admit that Petitioner's state petitions and current Habeas Petition are similar.  This coincidence, of course, is not surprising as a state court defendant can only present in federal court those claims that he properly submitted to the state courts for adjudication.

Respondents assert, however, that the Habeas Petition fails to particularize with clarity the manner in which the evidence justifies relief.  (Dkt. Entry 12, at 9.) Respondents' argument on this point "constitutes a kind of composite" of the Advisory Committee Notes indicating when granting a motion to dismiss may be appropriate.  (Id. at 2.)  The Advisory Committee Notes (1979 Adoption) provide that dismissal may be appropriate if it is determined:

[T]hat petitioner's claims have already been decided on the merits in a federal court; that petitioner has failed to exhaust state remedies; that the petitioner is not in custody within the meaning of 28 U.S.C. § 2254; or that a decision in the matter is pending in state court.  In these situations, a dismissal may be called for on procedural grounds, which may avoid burdening the respondent with the necessity of filing an answer on the substantive merits of the petition.

(Rules Governing Section 2254 Cases, Rule 4 Advisory Committee Notes.)  None of these situations apply to Petitioner's case.  Petitioner's claims have not been decided on the merits in federal court; failure to exhaust state remedies is not readily apparent from the face of the Petition; Petitioner is in custody within the meaning of 28 U.S.C. § 2254; and no decisions are currently pending in state court.

Respondent's assertion that the Petition fails to identify and describe the specific facts that point to a "real possibility of constitutional error," (Dkt. Entry 12, at 2), is without merit.  Rule 2 of the Rules Governing Section 2254 Cases states that habeas petitions must: "(1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested; (4) be printed, typewritten, or legibly handwritten; and (5) be signed under penalty of perjury by the petitioner or person authorized to sign it for the petitioner under 28 U.S.C. § 2242." Rules Governing Section 2254 Cases, Rule 2(c).  Petitioners do not have to present all of the evidence available in support of a claim since "[t]he petition is only the first step in a habeas corpus proceeding, following which, if appropriate, there can be discovery leading to the uncovering of evidence." McAleese v. Brennan, 483 F.3d 206, 215 (3d Cir. 2007).

Petitioner's Habeas Petition clearly satisfies each Rule 2 requirement.  As stated earlier, Petitioner has provided a detailed 186 paragraph petition, specifying twelve specific grounds for relief with facts supporting each ground.  (Dkt. Entry 1.)  Petitioner need only supply "facts supporting each ground."  See McAleese, 483 F.3d at 215.  The facts cited in the Habeas Petition fulfill this requirement.  Moreover, the Habeas Petition is signed and requests specific relief.  (Id.)  Thus, the Petition clearly satisfies the Rules Governing Section 2254 Cases.

III. Conclusion

For the reasons stated, Respondents' Motion to Dismiss will be denied.  An appropriate Order follows.[2]

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

---

[2] In light of the filings made by counsel after the motion to dismiss was briefed, see footnote 1 supra, there is uncertainty as to whether an Answer to the Habeas Petition is now necessary.  To resolve this uncertainty, a telephonic conference will be scheduled.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD YOUNG,                          :
                                        :
        Plaintiff                       :
                                        :        NO. 3:CV-07-016
    v.                                  :
                                        :        JUDGE VANASKIE
JAMES GRACE, Superintendent             :
of SCI-Huntington, et al.,              :
                                        :
        Defendants                      :

## ORDER

AND NOW, THIS 16th DAY OF DECEMBER, 2008, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Respondents' Motion to Dismiss (Dkt. Entry 11) is DENIED.

2. A telephonic status conference shall be held on Monday, December 29, 2008, at 11:30 a.m.  Counsel for Petitioner is responsible for making the arrangements for the conference call to (570) 207-5720, and all parties should be ready to proceed before the undersigned is contacted.

                                    s/ Thomas I. Vanaskie
                                    Thomas I. Vanaskie
                                    United States District Judge