IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD YOUNG,                          :
                                        :
                Plaintiff               :
                                        :       NO. 3:CV-07-016
        v.                              :
                                        :       JUDGE VANASKIE
JAMES GRACE, Superintendent             :
of SCI-Huntington, et al.,              :
                                        :
                Defendants              :

MEMORANDUM

Petitioner, Richard Young, brings this habeas corpus petition pursuant to 28 U.S.C. § 2254. In 1995, following a jury trial, Young was convicted of first degree murder and sentenced to death for the 1979 murder of Russel Loomis. (Pet., Dkt. 1, at ¶ 2.)[1] The Pennsylvania Supreme Court reversed and remanded Young's conviction in Commonwealth v. Young, 748 A.2d 166, 193 (Pa. 1999), finding that co-defendants' statements identifying Young as the murderer were improperly admitted. A retrial was held in 2003, and a jury again found Young guilty of first degree murder. Young was immediately sentenced to life

---

[1] For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court. The page numbers referenced in this Memorandum opinion refer to the page number of the electronic CM/ECF record.

imprisonment.  (Dkt. 1, at ¶ 3.)  Following post-sentencing motions and appeals, Young filed

this petition for habeas corpus pursuant to 28 U.S.C. § 2254, asserting that there were

twelve errors of constitutional dimension in the 2003 trial, requiring that his conviction be

reversed.  Careful analysis of the extensive record and the arguments in support of each of

Young's claims reveals that the state court findings are not contrary to clearly established

federal law, nor are the state court decisions based on an unreasonable application of

Supreme Court precedent.  Furthermore, those claims entitled to de novo review also do not

present a constitutional violation.  Accordingly, Young's petition will be denied.

I.    BACKGROUND

      A.    FACTUAL HISTORY

      On April 14, 1979, two trout fisherman discovered the body of Russell Loomis in a

river on a wooded mountainside.  (Dkt. 1, at ¶ 14.)  Loomis had been fatally shot and it was

the prosecution's theory that on April 11, 1979, Richard Young, William Slick, George

Cornell, and Ronald Hull lured Loomis to the area and shot him to prevent him from

testifying before a grand jury investigating fraud charges against Young and others.  (Id.)

      At the time of the shooting, Richard Young owned numerous businesses, including

John's Liquidations and John's Automotive, businesses that were the subject of a federal

white-collar crime investigation.  (Id. at ¶ 18.)  FBI Agent Daniel Glasgow's investigation into

Young's business practices began with a complaint involving a business known as Brown's

Wholesale.  (Id. at ¶ 23.)  Glasgow's investigation revealed that Brown's Wholesale was part of a "bust out" scheme involving Young, Hull, Cornell, Joseph Brizinski, and "hundreds" of other suppliers.  (Id.)  The scheme involved the setting up of fraudulent lines of credit at various trade shows which the participants had no intention to pay.  (Id. at ¶ 24.)

In April 1979, Loomis was allegedly scheduled to appear before a federal grand jury in connection with this "bust out" scheme.  (Id.)  The "bust out" scheme was corroborated by Loomis' girlfriend, Theresa Slick Hoffman.  Ms. Hoffman testified at Young's trial that on April 11, 1979, Loomis told her he was going with Young to retrieve a Jeep that was stuck in some mud.  (Id. at ¶ 27.)  The prosecution, over objection, offered evidence from several witnesses that Loomis had planned to help Young get a Jeep that was stuck in the mud, and his fear that "Young might harm his family."  (Id. at ¶ 31.)

Ronald Hull worked with Young in his businesses, and testified that a few weeks prior to Loomis's murder, he spoke with Young and Cornell concerning their belief that Loomis was planning to cooperate with federal investigators.  (Id. at ¶ 19.)  Hull claimed that Young, Cornell, Loomis, and he drove into the woods off Aston Mountain Road to retrieve a Jeep that was stuck in the mud on the mountain.  (Id.)  Hull explained that the men parked their vehicle fifty (50) yards from where Loomis's body was eventually found, walked into the woods, passed an old foundation (identified by Cornell as Loomis's "grave"), and as Loomis crossed a stream Young took out a handgun and fired two to three times at Loomis's back.

3

At this point, Hull testified that Loomis turned and started towards the others, yelling and cursing, and Cornell grabbed the gun and fired three more times until Loomis collapsed on a log with one leg extended into the creek. (Id.) Hull stated that he, Young, and Slick were unable to pull the body from the creek and therefore left it and returned to the vehicles. (Id. at ¶ 20.) Hull drove Loomis's vehicle to the Wyoming Valley Mall, where he abandoned it. (Id.)

Young presented testimony from a forensic pathologist, whose opinion was that "Russell Loomis was dead no more than 12 hours when his body was found on April 14, 1979." (Id.) Additionally, Young presented experts who testified that: (a) the April 11, 1979, time of death was wrong because there was no insect infestation of the body; (b) soil samples taken from the bottom of Loomis's vehicle could not have come from the same mountain his body was found on; (c) Loomis's vehicle could not have maneuvered in the remote area described by Hull; and (d) the trajectory of Loomis's wounds did not indicate that the shooter was directly behind Loomis as Hull testified. (Id. at ¶¶ 44 - 46.)

In addition to Hull's testimony, the prosecution presented the testimony of Harold Litts, who resided at the base of the mountain where Loomis's body was found. (Id. at ¶ 28.) Harold testified that on the evening of April 11, 1979, between 7:30 p.m. and 8:00 p.m., he and his brother heard noises that sounded like a woman screaming and fireworks; about thirty minutes later, Harold's brother saw a car parked near their gas storage and saw a

truck pull up and then leave.  (Id. at ¶ 28.)  The brothers, concerned about gas theft, drove

past the parked car.  (Id.)  The parked car was jacked up, the trunk was open, the trunk light

was on, and men were standing by the trunk.  (Id.)  After driving past the parked car, the

brothers turned around and one of the men stepped in front of the vehicle, forcing Harold to

drive around him.  (Id. at ¶ 29.)  When later describing the man to police, Harold stated that

he was large, like a body builder, but could provide no description of the other man with the

car, other than to say that he was also large in nature. (Id.)

Six years later, in 1985, Harold was shown a photo array that included nine (9)

photographs.  (Id. at ¶ 30.)  Of the nine photographs, two pictures were of Young, and there

were pictures of Slick, Cornell, Hull, Loomis, and three others.  Harold identified the picture

of Slick as the man who had stepped in front of the vehicle, but made no further

identification.  (Id.)

During the course of the next seven (7) years, numerous photographs of Young were

published in the local media.  In February 1992, Harold, his brother, and his attorney, met

with state troopers and reviewed a second photo array, which "included five of the original

nine photos, including the same two pictures of Young."  (Id.)  The photograph of Slick and

one of the photographs of Young were mug shots with tape on them.  (Id.)  After leaving the

room to discuss matters with his attorney, Harold returned and identified the mug shot of

Young as the man who had been standing by the car trunk thirteen (13) years earlier.  (Id.)

Harold's brother never made an identification.  (Id.)

It was the prosecution's theory that the motive behind Loomis's homicide was to prevent his cooperation with federal agents.  Thus, evidence of Young's "bust out" scheme was introduced at trial.  (Id. at ¶ 22.)  The prosecution presented Andrew Halupke, a member of the "bust out" scheme, as a witness, but Halupke could not remember the details of statements he made to the police in February of 1981.  (Id. at ¶ 32.)  Over objection, the prosecution was permitted to read Halupke's police statement into evidence, which revealed that Young had advised him not to testify in front of the grand jury, and that "Young had told Cornell not to worry, that they would get Loomis."  (Id.)  Moreover, the statement revealed that Halupke, Young, and Hull "spent several hours driving around the area, looking for a place to bury the body."  (Id.)

In addition to the testimony of Halupke, Hull, and Litts, the prosecution presented evidence that in 1980 Young left Pennsylvania and, under the name of Todd Devine, moved to Boise, Idaho, where he lived until apprehended in 1988.  (Id. at ¶ 34.)  The prosecution used Young's flight as consciousness of guilt evidence.  (Id.)  Moreover, a state police fingerprint expert was allowed to testify that one of Young's fingerprint cards, under the name of Todd Devine, showed scarring, an apparent attempt to obscure his identification as Richard Young.  (Id. at ¶ 35.) Christopher Cornell, whose father, George Cornell, was also allegedly involved in the homicide, testified (over objection) that while he was in jail he heard

Young tell his father, "that he is not going – is he [sic] not sinking with this ship alone." (Id. at ¶ 37.) Additionally, evidence supporting Young's conviction and undermining his alibi defense was presented.

## B. PROCEDURAL HISTORY

Young was charged with first and third degree murder, and in 1995 was tried with co-Defendant William Slick before the Honorable Jay W. Myers in the Lackawanna County Court of Common Pleas. (Dkt. 1, at ¶ 2.) A jury found him guilty of first degree murder and sentenced him to death. (Id.) The Pennsylvania Supreme Court reversed and remanded, finding that co-defendants' statements identifying Young as the murderer were improperly admitted. Commonwealth v. Young, 748 A.2d 166 (Pa. 1999). A retrial was held before the Honorable Forrest G. Schaeffer, from June 23, 2003, through July 11, 2003. (Id.) The above-stated evidence was presented. Petitioner was convicted of first degree murder, and immediately sentenced to life imprisonment. (Id. at ¶ 3.)

Post-sentence motions were filed on July 16, 2003, and supplemental post-sentence motions were filed on October 9, 2003. (Id. at ¶ 4.) Petitioner's post-sentence motions were denied on December 13, 2003. A timely notice of appeal was filed on January 8, 2004. (Id. at ¶ 6.) Petitioner's supplemental post-sentence motions were denied on January 13, 2004. (Id. at ¶ 7.) "Petitioner filed a Statement of Matters Complained Of on Appeal on January 27, 2004, and a Supplemental Statement of Matters Complained Of on Appeal on January

28, 2004." (Id.)  The Lackawanna County Court of Common Pleas filed a comprehensive Rule 1925(a) Opinion on May 10, 2004.[2]  (Id.)

On February 7, 2005, the Pennsylvania Superior Court issued a Memorandum Opinion.  Commonwealth v. Young, 873 A.2d 773 (Pa. Super. 2005).  The Superior Court, in addition to explaining its reasons for affirming the conviction, incorporated Judge Schaeffer's 75-page Rule 1925(a) opinion.  Young filed a timely Petition for Allowance to Appeal to the Supreme Court of Pennsylvania, which was denied on September 21, 2005. Commonwealth v. Young, 885 A.2d 42 (Pa. 2005).  Young's Petition for Writ of Certiorari to the United States Supreme Court was denied on April 17, 2006.  Young v. Pennsylvania, 547 U.S. 1080 (2006).

This habeas corpus petition was filed pro se on January 4, 2007, with requests to proceed in forma pauperis and for appointment of counsel.  (Dkt. 2)  Petitioner's requests were granted, and he is currently represented by counsel.  (Dkt. 6.)  Respondents have answered the Petition.  (Id.) The matter is ripe for review.

II.     STANDARD OF REVIEW

"The Antiterrorism and Effective Death Penalty Act of 1996 [("AEDPA")] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

---

[2] Pa. R.A.P. 1925(a).

extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Specifically, when a federal-law issue has been adjudicated on the merits by a state court, the federal court reverses only when the decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).[3] See generally, Knowles v. Mirzayance, 129 S.Ct. 1411, 1418-19 (2009); Gattis v. Snyder, 278 F.3d 222, 234 (3d Cir. 2002); Moore v. Morton, 255 F.3d 95, 104-05 (3d Cir. 2001).

The Supreme Court has held that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. Williams v. Taylor, 529 U.S. 362, 404, 405 (2000). As explained in Bell:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively

---

[3] Specifically, 28 U.S.C. § 2254(d)(1) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . .

unreasonable . . . .

Bell, 535 U.S. at 694 (citations omitted).

In a recently announced decision, Renico v. Lett, 130 S.Ct. 1855 (2010), the United States Supreme Court, quoting Williams, explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 1862. Therefore, a federal court may not grant habeas relief simply because it has concluded in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly. (Id.) Rather, the state court application must be objectively unreasonable. Renico added that this distinction creates a substantially higher threshold for obtaining relief under § 2254 and imposes a highly deferential standard for evaluating state court decisions. Simply put, "state court decisions [must] be given the benefit of the doubt." Id. (quoting Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam). Furthermore, resolution of factual issues by the state courts are presumed to be correct unless the petitioner shows by clear and convincing evidence that they are not. 28 U.S.C. § 2254(e)(1).

III.    DISCUSSION

Young seeks relief pursuant to § 2254 based on twelve alleged errors in his 2003 trial. He requests de novo review of his claims, averring that the Court of Common Pleas and the Pennsylvania Superior Court failed to adjudicate his federal constitutional claims, based in part on his contention that the courts failed to cite to any federal standards and

failed to discuss federal constitutional law. The failure to cite to federal standards, however, does not entitle Petitioner to de novo review. As explained in Early v. Packer, 537 U.S. 3, 8 (2002):

> A state-court decision is 'contrary to' our clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' Williams v. Taylor, 529 U.S. 362, 405-406, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000). Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contracts them.

In short, "the United States Supreme Court has held that the right to deferential review under AEDPA does not require citations to federal cases – 'indeed, it does not even require awareness' of federal cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" Armstrong v. Kerester, Civ. 08-1165, 2008 WL 5436015, at *6 (E.D. Pa. Dec. 30, 2008) (quoting Early, 537 U.S. at 8); see Veal v. Myers, 326 F. Supp. 2d 612, 624 (E.D. Pa. 2004). The standard of review will be determined independently for each claim.

## A.    CLAIM I - PATRICK TIGUE'S TESTIMONY

Young's first claim is that he was deprived his Sixth and Fourteenth Amendment confrontation right when testimony of Patrick Tigue ("Tigue") was admitted. (Pet., Dkt. 1, ¶ 50.) The prosecution was unable to locate Tigue during the 2003 trial, and, as a result, the

trial court admitted the testimony given by Tigue in the 1995 trial.[4] (Id.) Young contends that the use of Tigue's prior testimony violates the confrontation clause of the Sixth Amendment.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), the Court held that the confrontation clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross examination." See United States v. Jiminez, 513 F.3d 62, 76-77 (3d Cir. 2008).[5] Pursuant to Crawford, Tigue's testimony would not violate the

---

[4] In 1992, Young filed an alibi defense naming Tigue as an alibi witness. (Pet., Dkt. 1, ¶ 51.) A receipt, purportedly signed by Tigue on April 11, 1979, was admitted into evidence at both trials by the Commonwealth. (Id.) During the 1995 trial, Tigue was presented as-on-cross by the prosecution, and it was suggested that the receipt was fabricated. (Id.) Tigue was confronted with documents showing that he had been incarcerated in the Lackawanna County Prison on April 11, 1979, and Tigue's testimony was used to prove consciousness of guilt and disprove Young's alibi. (Id.)

[5] Crawford was decided after Young was convicted. On collateral review, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989). "Under the Teague framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." Whorton v. Bockting, 549 U.S. 406, 416 (2007). "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." Teague, 489 U.S. at 301. Crawford created a "new rule." Danforth v. Minnesota, 552 U.S. 264, 268-69 (2008). A case becomes final when "'the availability of appeal' has been exhausted or has lapsed, and the time to petition for certiorari has passed." Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 711 n.14 (1974). The Supreme Court's decision in
(continued...)

rules of evidence or the confrontation clause if Tigue was unavailable to testify and Young had a prior opportunity to cross-examine him.

Substantial evidence was produced showing that Tigue was unavailable during the 2003 trial. Detective Lisa Bauer ("Bauer") was questioned as to the efforts undertaken to produce Tigue. She stated: (1) she went to Tigue's Electric Street address three or four times, but no one was home (Notes of Testimony ("NT"), 12/5/03, at 97); (2) two detectives spoke with Tigue's sister, who indicated that Tigue no longer resided at that address (id.); (3) she contacted the postal inspector and the mail carrier, who indicated that they had not seen or heard from Tigue for about a year (id. at 97-98); and (4) she found no record of Tigue when she contacted domestic relations in Lackawanna County to determine whether Tigue had made any child support payments or had any outstanding warrants. (Id.) Detective Bauer further learned from the Bureau of Motor Vehicles that Tigue's driver's license had been suspended and not renewed (id. at 99), and learned from the District Attorney's Office that charges had been filed against Tigue at the former address. (Id. at 100.) Detective Bauer contacted the Lackawanna County Prison after his release, again determining that the only address on record was his former address. (Id.)

---

[5](...continued)
Crawford came out two months before the Lackawanna County Court handed down its Rule 1925(a) Opinion and years before Young exhausted his appellate rights. The "new rule" created in Crawford is applicable in this collateral review, as Young's claims were still on direct review when Crawford was decided.

Young had an opportunity to cross-examine Tigue at the 1995 trial. Tigue was called as-on-cross by the prosecution to dispute Young's alibi. Throughout his testimony, Tigue maintained that the receipt, dated April 11, 1979, and signed by Tigue and Young, was proper and did not make any statements against Young.  Even after the prosecution attempted to show that Tigue was in jail on April 11, 1979, and could not have signed the receipt, Tigue continued to assert that he did sign the receipt.  (NT, 8/24/95, at 23.)  Young's counsel, on cross-examination, showed that Tigue was before Judge Walsh on April 11, 1979, because he wanted to observe the arraignment of James Martin and Joseph Bossick, two people with whom Tigue had committed crimes.  (NT, 8/24/95, at 27.)  Tigue explained that he was not in jail that date and that his records have been mixed up because someone had been using his identification.  (Id. at 28.)  He said that the signature on the jail record was not his because it was spelled T-I-G-H-E, not T-I-G-U-E.  (Id.)  Young's counsel clarified that Tigue's records were mixed up with "Tighe's" in the past.  (Id. at 28.)

It is Young's position that the Commonwealth did not do enough to locate Tigue and if Detective Bauer had checked, she would have learned that Tigue was arrested on June 8, 2003, by the Scranton Police Department.  (Pet., Dkt. 1,  at ¶ 55.)  Accordingly, he claims it was error for Detective Bauer to not speak with the Clerk of Courts, check the docket, learn the names of the prosecutors, ask when Tigue was released, ask whether he was released on bail, speak to relatives other than Tigue's estranged sister, and delay in obtaining a

photograph of Tigue. (Id. at ¶ 57.)

The Lackawanna County Court of Common Pleas found Young's claim of a Sixth Amendment violation to be meritless. The court cited to Ohio v. Roberts, 448 U.S. 56 (1980), and McCandless v. Vaugh, 172 F.3d 255 (3d Cir. 1999), in analyzing the undertakings of Detective Bauer and Tigue's unavailability. The court determined that the prosecution had gone to reasonable lengths to produce the witness, the witness was unavailable, and Young had a full and fair opportunity to cross-examine Tigue at the 1995 proceedings. (Dkt. 10-2, at 8.)[6] Aside from requiring a question to be rephrased, the presiding judge at the 1995 trial placed no limitation on Young's examination of Tigue. (Id. at 16.) Furthermore, the record reveals that Young was not precluded from interrogating Tigue on whether he was on bail or incarcerated on April 11, 1979. (Id.) Accordingly, the court concluded that it did not err in allowing Tigue's testimony to be read into the record during the 2003 trial. (Id. at 17.)

The Superior Court relied on the fact that Tigue had maintained several residences during the relevant period and Detective Bauer's extensive attempts to locate him in

---

[6] The court emphasized that "the lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness," (Ct. of Cmn. Pls. Op., Dkt. 10-2 citing McCandless, 172 F.3d 255), and found that the Pennsylvania Supreme Court has found similar searches to be reasonable. (Id. at 13-14 (citing Commonwealth v. Douglas, 737 A.2d 1188 (Pa. 1999); Commonwealth v. Wayne, 720 A.2d 456 (Pa. 1998); Commonwealth v. Blair, 331 A.2d 213 (Pa. 1975)).

concluding that Tigue was unavailable and affirming the trial court's decision.[7]  The Sixth

Amendment confrontation issue was properly presented and adjudicated in the state courts.

The standards employed by the state courts did not contradict federal law.  See Early, 537

U.S. at 8.  Accordingly, Petitioner is entitled to relief only if the state court findings are

"contrary to, or involved an unreasonable application of, clearly established Federal law," or

"resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d).

Young argues that the state court findings are contrary to Barber v. Page, 390 U.S.

719 (1968).  (Pet. Br., Dkt. 40-2, at 33.)  In Barber, the Court determined that the state had

made "absolutely no effort" to obtain the witness other than to ascertain that he was in a

federal prison outside the jurisdiction.  390 U.S. at 723.  The Court further emphasized that

the sole reason why the witness was not present to testify in person was because the state

did not attempt to seek his presence.  Id. at 725.  Here, it cannot be said that the

Commonwealth made "absolutely no effort" to locate Tigue.  Accordingly, Barber, is

distinguishable.

In Ohio v. Roberts, 448 U.S. 56, 75 (1980), also relied upon by Young, the Court

concluded that the prosecution made a good faith effort to locate the witness because the

_____

[7] The court further explained that Tigue was "a transient individual who had a rocky
relationship with the law.  Tigue testified that he had maintained several residences during
the relevant period." (Commonwealth v. Young, Dkt. Entry 9, at 8.)

16

prosecutor spoke with the witness' mother and issued a subpoena to the witness on five separate occasions. In recognizing that the prosecutor could have taken additional steps, the Court explained, "[o]ne, in hindsight, may always think of other [steps to take]." Id. at 75-76. The state court rulings do not contradict Roberts as the prosecution undertook reasonable steps to obtain Tigue's presence and conducted an even more thorough investigation than that in Roberts.

Lastly, Petitioner cites United States v. Agurs, 427 U.S. 97 (1976), for the proposition that the prosecution is responsible for knowing the contents of its file and accordingly should have known that Tigue had been recently imprisoned and contacted him during his imprisonment. Agurs, however, is distinguishable. Agurs involved information within the prosecutions' files regarding the case in question, not an entirely different action. Tigue's arrest was unrelated to Young's trial, and accordingly Agurs is distinguishable.

Petitioner also cites to United States v. Mann, 590 F.2d 361, 367 (1st Cir. 1998), McCandless, 172 F.3d 255, Commonwealth v. Faison, 305 A.2d 44 (Pa. 1973), and Corl v. Kacmar, 571 A.2d 417 (Pa. 1990), to support his position that established federal law was violated. These cases, however, are unpersuasive as they are not clearly established federal law as determined by the Supreme Court.

The Supreme Court has stated that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in

17

whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (citing Ohio v. Roberts, 448 U.S. 56, 73 (1980)). In Roberts, the Court concluded that "[a] holding that every case involving prior testimony requires such an inquiry [an effectiveness inquiry] would frustrate the principal objective of generally validating the prior-testimony exception in the first place – increasing certainty and consistency in the application of the Confrontation Clause." 448 U.S. at 73. Here, Young was provided with the opportunity to cross-examine Tigue and established that Tigue's records were often mixed up with a person by the name of Tighe.[8]

Young has failed to offer a Supreme Court case that directly conflicts with the trial court's ruling, nor has independent review uncovered any cases which prove that an "unreasonable application of clearly established Federal law" has occurred. Consequently, for Young to be entitled to relief, the state court decisions must be "based on an unreasonable determination of the facts in light of the evidence presented in the state court

---

[8] Furthermore, while not argued by the parties, it is arguable that Tigue's testimony was not adverse to Petitioner and thus the Sixth Amendment is inapplicable. "The Sixth Amendment guarantees a defendant the right 'to be confronted with the witnesses against him.'" Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, at 2534 (2009)(emphasis added). "The text of the Amendment contemplates two classes of witnesses – those against the defendant and those in his favor. The prosecution must produce the former; the defendant may call the latter." Id. Young refers to Tigue as an "alibi witness." (Pet., Dkt. 1, at 24; Br., Dkt. 23, at 31.) According to the Supreme Court's distinction, an alibi witness would be one who is in the defendant's favor and one whom the defendant may call. See Melendez-Diaz, 129 S. Ct. at 2534. The Commonwealth would be under an obligation to produce Tigue only if he were a witness against Young. See id.

proceeding." See 28 U.S.C. § 2254(d)(2).

The state court decisions were not based on an unreasonable determination of the facts in light of the evidence presented. Young fails to point to any misstatements of fact in the state opinions, nor were any facts overlooked or improperly construed. Accordingly, Young's Sixth Amendment claim that Tigue's testimony was improperly admitted is without merit.

## B. CLAIM TWO - CORNELL TESTIMONY

Young's second claim is that the prosecution failed to disclose that Young was in an isolation cell at the time Christopher Cornell claims to have overheard him admit to Loomis's murder, and thus, Cornell was allowed to testify falsely. (Dkt. 23, at 46.) At the 2003 trial, Chris Cornell was called as a prosecution witness. (NT, 6/27/03, at 232.) Cornell indicated that he was incarcerated in the Lackawanna County Prison from October of 1989 until September of 1993, and Young had arrived in 1991 during Chris Cornell's incarceration. (Id. at 236.) Cornell knew Young through his father, George Cornell, and prior to March of 1992, he spoke to Young and would sometimes go to Young's holding cell and talk with him. (Id. at 237.) Cornell's father was arrested for murder in March of 1992. (Id. at 239.) Cornell indicated that he had overheard a conversation between his father and Young regarding the pending murder case in which Young said "that he is not going – [he] is not sinking with this ship alone." (Id. at 240.) On cross-examination, Young's counsel questioned whether

Cornell was aware that Young had been put into the "camera cell" on March 6, 1992. (Id. at 242.) Cornell reiterated that he was not good with dates, and could not exactly remember when this conversation occurred:

> I'm not sure of the dates, but I'm not a fool and I do remember being in the cell and there should be records that Mr. Young was on the two 400 side at the same time as my father and myself and the conversation took place. I mean, I know it. I was there. I heard it. So whether he is in a camera cell or in another place makes no difference to me because I know what I heard.

(Id. at 242-43.) Young contends that Cornell lied and that the prosecution was aware that he was in segregated housing during the alleged conversation.

Young was housed at Lackawanna County Prison beginning in 1991 and was released to the Sheriff for a court appearance on March 6, 1992. (3/6/92 Writ.) A March 6, 1992 Prison Memorandum, from Warden Thomas P. Gilhooley, states:

> Mr. Young was arrested today and charged with Murder 1st and 3rd. The D.A.'s office advises me that he will be transferred immediately to SCI - Dallas after processing.
> At approximately 12:30 p.m. Mr. Young was brought back to the Prison accompanied by ADA Minora, Defense Atty. Paul Walker and 3 State Policemen.
> ADA Minora advised us to prepare Mr. Young for transport. . . . . . . . .
> At approximately 1:30 p.m. Mr. Young was transported to SCI-Dallas.
> NOTE:
> Shortly after his departure, I received a telephone call from Judge Richard Conaboy advising me that he was ordering Mr. Young back to the LCP pending a hearing on the legality of transfer to be held on March 9, 1992.

(3/6/92 Memo 1, Petitioner's Reproduced Record ("PRR"), at 68a). An Order filed in the

Lackawanna County Court of Common Pleas at 10:25 a.m. on March 6, 1992, indicates that

Petitioner had "been arrested for Murder in the first degree and related charges," and that

"[p]resently incarcerated at the Lackawanna County Prison are several potential witnesses

against the Defendant. The potential for witness intimidation and tampering exits [sic]."

(3/6/92 Order.)

In a second March 6, 1992 Memorandum from Warden Thomas P. Gilhooley, to

Captain Jack Harvey, it was noted:

> Mr. Young was arrested today for Murder 1st and 3rd. He will be separated
> from the prison population until after the transfer hearing ordered by Judge
> Richard Conaboy today.
> Because Mr. Young is considered a threat to potential witnesses in this
> prison, Mr. George Cornell and possibly his son Chris, I am directing you to
> hold Mr. Young in the camera cell 803 until the transfer to SCI-Dallas.
> The legality of the transfer will be heard by Judge Conaboy on March 9, 1992.
> . . . .
> Please make all officers on the three shifts aware of this memorandum.

(3/6/92 Memo. 2, PRR, at 69a.) A March 9, 1992 Memorandum from Deputy Warden

Hilborn to the Lower Diamond states: "On March 9, 1992 Judge Conaboy ordered that

Richard Young be transferred to the State Correctional Institution at Dallas. His legal work

in the cell will be moved from cell 803 by the block runner, Carl Abood, to the wardens [sic]

office." (3/9/92 Memo, PRR, at 70a.) A second writ indicated that Young was released to

the Sheriff's Department for a hearing on March 11, 1992, at 9:00 a.m. There were no

additional documents regarding Young's location or segregation during the pertinent period.

Post-trial, on December 5, 2003, the Court held a hearing on Young's claim that Cornell's testimony was improperly admitted. Young called two witnesses: 1.) Timothy Betti, Records Custodian at the Lackawanna County Prison (12/5/03 Trans., at 8); and 2.) Frank Chiarelli, Lieutenant of Security at Lackawanna County Prison. Betti did not work at the prison in 1992, but indicated that the effect of a separation order is that the individuals "are kept apart from each other." (Id. at 10, 12.) Young's second witness, Chiarelli, was responsible for "the daily activities at the prison . . . ." (Id. at 15.) Chiarelli did not hold this position in 1992, but did work in the prison in 1992 as a sergeant handling the daily activities of inmates and officers in a certain section of the prison. (Id. at 16-17.) When discussing in-camera cell 803, where Young was allegedly confined, Chiarelli initially indicated that only security staff had access to the cell and that the general population prisoners would not be able to visit or have conversations with a prisoner there. (Id. at 17.) In describing a separation order, Chiarelli indicated that the officers "put [the inmates] in different places at the prison. . . . We had limited space then. They are pretty well separated, not as good as we'd like [them] to be." (Id. at 18.) Chiarelli stated that if other people had legal questions, they would ask Young, and therefore, Young had access to other prisoners on that basis. (Id. at 21.) At the conclusion of Mr. Chiarelli's testimony, the court asked whether Petitioner may have been in general population prior to the separation order. (Id. at 23.) Mr. Chiarelli agreed that was correct. (Id.)

Young avers that by allowing Cornell to testify his Sixth and Fourteenth Amendment right to have the prosecution disclose exculpatory evidence was violated, as was his right to present a defense, and to confrontation. (Pet. Br., Dkt. 23, at 47.) Although Young lists these alleged violations, he only elaborates on the alleged Brady violation, and the subsequent effects, with no discussion of the deprivation of the right to present a defense.[9]

The Court of Common Pleas found Young's arguments meritless. (Ct. Cmn Pl., Dkt. 10-2, at 18.) Citing Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995), along with numerous state cases, the court found no Brady violation in the failure to produce prison records pertaining to Young's incarceration. While acknowledging that the files of police agencies of the same government bringing the prosecution must be disclosed to the defense (Ct. Cmn. Pl., Dkt. 10-2, at 19), the court determined that the prosecution had no duty to obtain prison files as they were not in the prosecutions' possession:

> [T]he Lackawanna County Prison cannot be characterized as a police agency or an agency involved [sic] this case or in the prosecution of this matter thereby placing a duty upon the Commonwealth to obtain prison files and/or records and disclose same to the Defendant. The file or records contemplated by Brady or Kyles are those which fall within the realm of mandatory discovery. There exists no evidence, let alone allegation, that either Lackawanna County Prison or its agents were involved in the subject investigation thus resulting in their records falling into the disclosure mandate

---

[9] Although Young's state court briefs argue the presentation of Cornell's testimony altered the defense strategy, he does not present the issue in this collateral attack.

> adopted in <u>Burke</u>, <u>supra</u>.  Consequently, since we find that the prosecutor did not have a duty to obtain the records, he did not breach his duty to disclose them in any manner.  <u>Brady</u>; Rule 573.

(<u>Id.</u>)  The Superior Court also found that the prosecution was never in possession of Young's prison records, that Young had equal access to this evidence, and that the prosecution thus had no duty to disclose the alleged files.  (Sup. Ct., Dkt. 9, at 9.)

Young argues that <u>de novo</u> review should be undertaken because the courts failed to adjudicate his remaining claims.  (Pet. Br., Dkt. 23, at 48.)  His state court claims, however, do not present any additional federal constitutional claims.  Petitioner's "Table of Contents" identifies two subsections under this claim: A) Facts; and B) <u>Brady</u> error. (<u>Id.</u> at 4.)  Moreover, the argument section of Petitioner's brief focuses solely on the <u>Brady</u> argument.  As the state courts clearly addressed the <u>Brady</u> claims, the deferential standard of review is appropriate.

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995), the Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  (citations omitted).

Young's citation to Pyle v. Kansas, 317 U.S. 213 (1942), is unpersuasive. In Pyle, the petitioner had a letter from the former prosecuting attorney stating Pyle's "conviction was a grave mistake." Id. at 215. Moreover, Pyle had an affidavit from witness Murl Hudson stating he "was forced to give perjured testimony against Harry Pyle under threat by local authorities . . . ." Id. No such evidence has been produced in the current case. Furthermore, the Court has yet to hold that material in prison records is evidence in the prosecution's possession under the Brady standard, although, numerous circuit courts have held that such records are not subject to Brady. See, e.g., United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996); United States v. Ellender, 947 F.2d 748, 757 (5th Cir. 1991); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

Petitioner argues that the Prosecution "failed to correct the clearly false testimony" of Cornell, violating Banks v. Dretke, 540 U.S. 668, 696 (2004). In Banks,

> the State withheld evidence that would have allowed Banks to discredit two essential prosecution witnesses. The State did not disclose that one of those witnesses was a paid police informant, nor did it disclose a pretrial transcript revealing that the other witness' trial testimony had been intensively coached by prosecutors and law enforcement officers.

(Id. at 675.)

Unlike Banks, Young has not provided any evidence that the prosecution knew that Chris Cornell's testimony was false. Young does not cite a specific Supreme Court decision clearly contrary to the state court decisions, and independent research has not uncovered

25

any such cases. (Dkt. 23, at 48.)  Consequently, the state court decisions are not contrary to clearly established federal law.

Without citation to the record, Petitioner contends that the state courts' decisions are objectively unreasonable because the prosecution had actual knowledge that Young had been separated from the general population when the conversation with Cornell allegedly occurred.  (Dkt. 23, at 51.)  In the alternative, Petitioner argues that even if the prosecution did not have actual knowledge, "it had constructive knowledge that records or evidence existed that would have demonstrated that Petitioner was . . . isolated, based on its knowledge of the separation order . . . ." (Id. at 52.)

The evidence in the record shows: (1) on March 6, 1992, at 10:25 a.m., Judge Harhut ordered Young be incarcerated in a state prison and not Lackawanna County Prison because of the potential for witness intimidation and tampering (3/6/92 Order); (2) at 1:30 p.m. Young was transported from Lackawanna County Prison to SCI-Dallas (3/6/92 Memo, PRR, at 68a); (3) Assistant District Attorney Minora was present at 12:30 p.m. on March 6, 1992, with Defense Attorney Paul Walker as Young was prepared for transport (id.); (4) shortly after Young's departure, Warden Thomas Gilhooley received a telephone call from Judge Richard Conaboy advising that Young had been ordered back to Lackawanna County Prison pending a March 9, 1992 hearing on the legality of the transfer (id.); (5) on March 6, 1992, Young was ordered "seperated [sic] from the prison population until after the transfer

hearing." (3/6/92 Memo, PRR, at 72a); and (6) on March 9, 1992, Judge Conaboy ordered

Young be transferred to SCI-Dallas and his legal work be moved from cell 803 (3/9/92

Memo, PRR, at 70a). Testimony presented at the December 5, 2003 hearing reveals: (1)

record custodian Timothy Betti's understanding was that the effect of a separation order is

that "individuals that are cited on the separation are kept apart from each other"; (2) only

security staff had access to cell 803 and other prisoners from the general population would

not be able to visit or have conversations with a prisoner there (12/5/03 Test., at 17); (3)

Frank Chiarelli was unsure whether Young had conversations with other prisoners after the

separation order was issued (id. at 20); (4) if other people had legal questions, they would

ask Young those questions; and (5) before the separation order, Young may or may not

have been in the general population. (id. at 23.)

These facts, taken as a whole, do not support a contention that the state courts'

analysis "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding." See 28 U.S.C. §

2254(d)(2). Young has failed to provide evidence that prison records regarding his

segregation were in the prosecution's possession, or that the prosecution was aware of their

existence. Moreover, there is evidence in the record that Young may have had contact with

other inmates during the course of his segregated incarceration. (See 12/5/03 Test., at 23.)

Other than broad allegations that the prosecution knew that Young and Chris Cornell were

separated at all times, Young has provided no evidence that the prosecution was aware of this fact. Accordingly, the state courts' decisions were not based on an unreasonable determination of the facts in light of the evidence, and Young's claim of a Sixth Amendment violation premised on Christopher Cornell's testimony is without merit.

C.    CLAIM THREE - ANDREW HALUPKE'S STATEMENT

Petitioner's third claim is that his Sixth Amendment right to confrontation was violated when Andrew Halupke testified on the prosecution's behalf. (N.T. 6/26/03, at 113.) As a result of his business association with Young, Halupke pled guilty to federal mail fraud charges and served jail time. (Id. at 114.) He indicated that in preparation for trial he had reviewed a statement given to the Pennsylvania State Police in 1981, but did not have a current recollection of the matters in the statement. (Id. at 115.) He was shown an original copy of the report with his signature indicating that the information was "true and correct to the best of [his] knowledge and belief," and was "given of [his] own free will and accord and without any promises or threats." (Id. at 116-17.) After reviewing the statement, however, he had no present recollection of the contents of the statement. (Id.)

The prosecution then sought to read the statement to the jury. (Id. at 118.) Young's counsel objected, but the trial court allowed the statement to be read into evidence as past recollection recorded. (Id. at 120.)

The statement revealed that Halupke had never met Loomis but that Young had

identified Loomis in passing (id. at 122); that Halupke knew Young and they would visit socially (id. at 123); and that in January or February of 1979, Young asked Halupke to go into business with him as the owner of a business called "Andy's Wholesale" that was run "for losses for income tax purposes." (Id. at 124.)

The statement further recounted that when the FBI investigation into Young's business dealings began, Halupke was subpoenaed. With regard to the subpoena, Halupke testified that Cornell and Young told him to go to Monticello, New York, and tell the FBI that his car broke down, which he did. (Id. at 125-26.) The next week, Halupke was again subpoenaed; this time, Young told him to plead the Fifth. (Id. at 126.) In addition to advising him to plead the Fifth, Young also provided Halupke with a slip from G&G Towing to verify that his car broke down and had been towed the week before. (Id.)

On either March 13 or March 14, 1979, Halupke indicated that Young and Cornell became angry while discussing Loomis and said "we'll get him" and "that guy has got to go," referring to Loomis. (Id. at 128.) Halupke stated that he, Young, and Ronald Hull went out for a drive on April 8, 1979, looking for a place to put Loomis's body:

> We made about two stops in this area. We continued on and later Young said that he didn't like the strippings. . . . There was a logging road and Young checked that road along with a few other places. . . . Young said coal mining is going to come back and someone might find the body. We spent about four hours riding around looking for the place. Rick then stated that he had a garage somewhere with a dirt floor and he said that would be a good place to put the body.

(Id. at 129-30.)  When asked if Young was talking about killing Loomis, Halpuke responded:

"Young mentioned water.  I told him to stay away from water because Saturday was the first

day of trout season."  (Id. at 130.)  Halupke's statement also indicated that Young had asked

him to get drugs to put on Loomis to make it look like drugs were involved in the murder. (Id.

at 130-31.)

      During cross-examination, Halupke indicated that he did not remember the events in

the statement (id. at 133), and stated that he had been interviewed numerous times, with "a

little bit" of police pressure that stopped after he gave the statement.  (Id. at 136-37.)

Halupke indicated that "[p]robably all" of the statement was true and that he could remember

they went for a walk, but could not remember the details.  (Id. at 140-41.) During closing

instructions to the jury, the court gave instructions on accomplice testimony.[10]

---

[10] The jury was instructed:

      When a Commonwealth witness was so involved in a crime charged
that he was an accomplice, his testimony has to be judged by special
precautionary rules.  Experience shows that an accomplice, when caught, will
often try to place the blame falsely on someone else.  He may testify falsely in
the hope of obtaining favorable treatment or for some corrupt or wicked
motive. . . .
      In view of the evidence of the criminal involvement of . . . Andrew
Halupke . . . , your [sic] must regard each of them as an accomplice in the
homicide of Russell Loomis . . . . .

     . . . .
      The testimony and police statements of an accomplice are viewed with
disfavor because they come from a corrupt and polluted source. . . .

                                              (continued...)

Petitioner raised this issue in his appeal from the 1995 trial. The Pennsylvania Supreme Court determined that the testimony satisfied the past recollection recorded standard in Commonwealth v. Cargo, 444 A.2d 689 (1982), and consequently was properly admitted. Commonwealth v. Young, 748 A.2d 166, 177 (Pa. 1999). The court found that Halupke had firsthand knowledge since he took part in the events described, that although the statement was made two years after the events, the events were ones that would likely be remembered, Halupke had no present recollection of the events, and he vouched for the accuracy of the statement. Id.

Relying on the Pennsylvania Supreme Court's decision and other precedent, the Court of Common Pleas admitted Halupke's statement at the second trial. Moreover, an appropriate instruction was given to the jury to inform them to consider Halupke's claims with caution. (Ct. Cmn. Pl., Dkt. 10-2, at 59, (quoting NT, 7/11/03, at 128-30)). The Superior Court found that the statement was properly admitted as a past recollection recorded and the jury instruction neutralized any potential prejudice. (Sup. Ct., Dkt. 9, at 10.)

Petitioner avers that the "court failed to recognize or even acknowledge the federal

---

[10](...continued)
  However, if you are satisfied beyond a reasonable doubt that the testimony of the accomplice is true and that the accomplice's testimony is sufficient . . . . you can find the defendant guilty upon the testimony of an accomplice alone.

(Jury Inst., 7/11/03, at 128-30.)

claims raised . . . and, instead, relied on its state-law evidentiary ruling to conclude that the statement was admissible." (Dkt. 23-2, at 8.) Although the state courts do not rely on federal law, the state law cited by the state courts, specifically Commonwealth v. Cargo, 444 A.2d 639 (Pa 1982), does not contradict any clearly established Supreme Court case. The state courts, however, limited review to the state law evidentiary issues, and failed to acknowledge or adjudicate the Sixth Amendment confrontation argument. Accordingly, while the state courts clearly adjudicated Young's evidentiary claims, the Sixth Amendment confrontation claim was not adjudicated and de novo review is necessary. See, e.g., Cone v. Bell, 129 S. Ct. 1769, 1784 (Apr. 28, 2009).

Petitioner claims that admission of Halupke's testimony violated his Sixth Amendment confrontation rights because "he was denied any meaningful opportunity to cross-examine Halupke because, when confronted with questions surrounding the details of the police statement, he relied on his 'inability to recall' those details." (Dkt. 23-2, at 45.) As discussed earlier, the Confrontation Clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54. In California v. Green, 399 U.S. 149, 161 (1970), the Court noted that "none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial." The Court in Green found

that "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases . . . support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." Id. at 162.  In United States v. Owens, 484 U.S. 554, 559 (1988), the Court was squarely presented with the question of whether a witnesses' lack of memory violates the confrontation clause and found that "'the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Id. (quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987)).  "The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." Id. at 560.[11]   The Court ultimately held that neither the rules of evidence nor the confrontation clause are "violated by admission of an identification statement of a witness who is unable, because of memory loss, to testify concerning the basis for the identification." Id. at 564.

Young avers that his Sixth Amendment confrontation right was violated because Halupke's memory loss made him "unavailable" for cross-examination.  (Dkt. 23-2, at 2-3.)

---

[11] The Court stated, "[w]e do not think that a constitutional line drawn by the Confrontation Clause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect." Id.

He has failed to provide citation to any case holding that a defendant's confrontation rights were violated where the witness whose prior statement is used as past recollection recorded was available and subject to cross examination. Instead, Young's citations each involve cases where the witness was physically unavailable. See Pointer v. Texas, 380 U.S. 400, 407 (1965) (witness left jurisdiction and did not appear at trial); Barber v. Page, 390 U.S. 7, 19 (1968) (witness did not testify at trial); Bruton v. United States, 391 U.S. 123 (1968) (witness did not testify and was not subject to cross-examination).

Young was given the opportunity to cross-examine Halupke. During that cross-examination, Young was able to show that Halupke was questioned for over six hours on the night he gave the statement (NT 7/26/03, at 134), that Halupke did not type the statement and he could not remember who did (id. at 135), that Halupke felt some police pressure (id. at 136), that the police pressure stopped once Halupke gave the statement (id. at 137), that Halupke had been interviewed numerous times on separate occasions (id. at 136), that Halupke would have done just about anything (other than lie) to get the police off his back (id. at 139), and that Halupke was never charged as an accessory, accomplice, or co-conspirator in Loomis' murder (id. at 140). Halupke indicated that he had no recollection of ever going to Daleville for a walk around, ever going to the mountains in Daleville with Young, and ever going to Painters Creek or Panthers Creek. (Id. at 142.)

Young was clearly provided with the opportunity to cross-examine Halupke as

34

required by the Sixth Amendment.  See Owens, 484 U.S. at 560.  Moreover, "the

confrontation clause guarantees only an opportunity for effective cross-examination, not

cross-examination that is effective in whatever way, and to whatever extent the defense

might wish."  Id. at 559.  As Young was afforded the opportunity to cross-examine Halupke

and since the confrontation clause is not violated by admission of a statement "of a witness

who is unable, because of memory loss, to testify concerning the basis" of the statement,

Owens, 484 U.S. at 560, Petitioner's Sixth Amendment rights were not violated. See

Flonnory v. Phelps, No. 08-566, 2010 WL 3023657, at *5 (D. Del. July 30, 2010)

(Crawford not implicated by admission of witness's statement to police officer where witness

"was present at trial and subject to cross-examination").

### D.  CLAIM FOUR - TROOPER JAMES'S TESTIMONY

Young's fourth claim is that his Sixth and Fourteenth Amendment rights were violated

when Retired Trooper Robert James was permitted to read statements attributed to Young

in a police report.  (Pet. Br., Dkt. 23-2, at 10.)  Trooper Robert James testified at Young's

2003 trial regarding an interview he had conducted with Young.  (NT 7/2/03, at 52.)  After

providing a brief history of his work experience, Trooper James indicated he and Corporal

Joseph Mraz had interviewed Young on April 16, 1979, to find out if he knew Loomis.  (Id. at

53.)  When asked what Young told him, Trooper James requested to review the police

report generated by Corporal Mraz.  (Id.)  Young's counsel objected to Trooper James

reading from the report and argued that the report should only be used to refresh his recollection.  (Id.)  The court agreed and directed Trooper James to use the report to refresh his recollection.  (Id.)  Trooper James stated that Young's address was determined to be 837 Foote Avenue in Duryea Pennsylvania in Luzerne County.  (Id. at 55.) Trooper James then testified:

> Mr. Young indicated that . . . he was the owner of a business address, John's Automotive and Variety Store located on Route 6, Main Street in Childs, Pennsylvania, Lackawanna County and indicated a phone number attached to that business.  Mr. Young went on to state that I have known Russ Loomis for six months prior to his death. He was not employed by me directly.  He was self-employed as a contractor.  He did some roofing work.

(Id. at 55-56.)  At this point, Young's counsel objected, stating that Trooper James was reading directly from the report.  (Id. at 56.)[12]  The prosecution then asked Trooper James if he could remember the information without reading from the report, and Trooper James stated, "[b]etter if I read it from the report."  (Id.)  The court instructed, "[w]hat you have to do

---

[12] The Report states:

Richard Francis YOUNG, W, M, 27, Home Address 837 Foote Ave. Duryea, Luzerne Co. Pa. Phone 717-457-9603. . . . Mr. YOUNG stated– "I have known Russ LOOMIS for 6 months prior to his death.  He was not employed by me directly, he was self employed as a contractor.  He did some roofing work, cleaned up, moved machinery and general repairs for me, but all under contract."

(Supp. Rep., 4/17/79, at 1.)  Accordingly, the only information that was read directly from the report was information on how long Young knew Loomis and Loomis's employment history. (NT 7/2/03, at 55-56; Supp. Rep. 4/17/79.)

under the rules is see if the report refreshes your recollection and then if it does you can testify from your recollection as refreshed." (Id.) Young's counsel requested a mistrial, arguing that the prejudice to Young as a result of Trooper James' actions were incurable as inadmissible hearsay had been read into the record. (Id. at 57.) The court denied the motion, but issued a limiting instruction: "Members of the jury, you should totally disregard that portion of the report which the officer already read. That is not for you to consider." (Id. at 58.)

Questioning resumed and Trooper James was asked Young's home and business address. (Id.) Trooper James responded: "Mr. Young indicated his home address was 837 Foote Avenue in Duryea, Luzerne County, Pennsylvania. Care of John's Automotive and Variety Stores, Route 6, Main Street, Childs, Lackawanna County, Pennsylvania." (Id. at 58.) Young's counsel again objected, stating that Trooper James was still reading from his report.[13] (Id.) The court stated: "Well, I – I am not certain of that. I can't see the report from the bench." (Id. at 59.) The prosecution asked Trooper James whether he was "reading and testifying from [his] memory?" (Id.) To which Trooper James responded, "Yes," and the court indicated that questioning could proceed.

Trooper James's testimony revealed that Young knew Loomis for six months prior to

---

[13]The Report states: "Home Address 837 Foote Ave. Duryea, Luzerne Co. Pa. Phone 717-457-9603. Business Address C/O John Automotive & Variety Store, Rt. 6, Main St. Childs, Lacka Co. Pa. Phone 717-876-4999." (Supp. Rep., 4/17/79.)

his death, that Loomis was self-employed as a contractor, Loomis did general repair contract work for Young, other people worked with Loomis, Young learned of Loomis's death from the paper, Sergeant Scavo in Carbondale may have some helpful information, Young last saw Loomis on Wednesday, April 11, 1979 at P.J.'s Diner, Loomis had told him he'd killed a man in Buffalo, New York, a man named Ismo sold drugs for Loomis in that area, there was a hit out on Loomis, and Sergeant Spencer of the Honesdale Police Department was the person to be contacted to arrange for a hit man. (Id. at 64.)

The Superior Court, adopting the trial court's finding, found that although the prosecution initially failed to provide an adequate foundation for reading the reports, an immediate cautionary instruction to disregard the portion read was properly given to the jury and up until that point the testimony was only background information and did not implicate Young in Loomis's murder. (Superior Court Opinion, Dkt. 9, at 11.) Accordingly, the Superior Court found that the cautionary instruction was an adequate remedy under the circumstances and the extreme remedy of a mistrial was not appropriate. (Id.)

Young argues the state courts failed to adjudicate his federal claims and, consequently, this Court should employ a de novo standard of review. (Dkt. 23-2, at 10.) Because the state courts limited review to the evidentiary issues created by Trooper James's testimony, de novo review is necessary for the Sixth Amendment confrontation clause claim. See, e.g., Cone, 129 S. Ct. at 1784.

In support of his assertion that his constitutional rights were violated, Young argues:
1) "[t]he United States Supreme Court has long condemned trial by written statements, affidavits and accusation. Lilly v. Virginia, 527 U.S. 116 (1999); Lee v. Illinois, 476 U.S. 530, 541 (1986); Crawford v. Washington, 541 U.S. 36 (2004);"[14] and 2) "cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrant relief. E.g., Kyles v. Whitley, 514 U.S. 419, 437-38 (1995); Taylor v. Kentucky, 436 U.S. 478, 488 (1978)." (Dkt. 23, at 10.)[15] Review of Young's claim, both individually and in combination with the other alleged deficiencies in his trial, does not entitle him to relief.

The Sixth Amendment provides that in criminal prosecutions the accused has the right to "be confronted with the witnesses against him." U.S. Const., amend. VI. In this situation Trooper James was on the stand. He was available for cross-examination and Young cross-examined him. Accordingly, the presence of the witness and right to cross-examine were secured as required by Crawford. He was unable to recall the events at issue, referred to his notes, began to improperly read from his notes, and the court directed

---

[14] In Lilly, a pre-Crawford case, the Court held that the statement of a non-testifying accomplice which implicated the accomplice and the defendant was not sufficiently reliable to be admissible without allowing the defendant the opportunity to cross-examine the accomplice. 527 U.S. at 137. In Lee, also a pre-Crawford case, the Court held that an accomplice's confession implicating the defendant was presumptively unreliable and did not bear indicia of reliability. 476 U.S. at 539. Neither case is controlling as the cases involved non-testifying witnesses.

[15] Young fails to further elaborate on the applicability of these cases to the facts at hand.

the jury to disregard that testimony. The jury instruction was properly issued and Young's

rights were not violated by failing to declare a mistrial.

### E. CLAIM FIVE - FORMER-FBI AGENT DANIEL GLASGOW'S TESTIMONY

Petitioner's fifth claim is that his Sixth and Fourteenth Amendment rights were

violated when Former-FBI Agent Daniel Glasgow testified concerning Young's role in a "bust

out" scheme. Glasgow testified that around the time of the murder he had investigated

some businesses in Honesdale and Childs, Pennsylvania, as a result of complaints

concerning skateboards that had been purchases and delivered to Pennsylvania but never

paid for. (NT 6/27/03, at 43-44.) Glasgow eventually learned that approximately 44 or 46

companies in different states were involved in a "bust out scheme" where companies were

organized, ordered merchandise, had the merchandise delivered, and then disappeared

with the merchandise or sold the merchandise to a fence. (Id. at 44-47.) Young, Loomis,

and other real and fictitious people were allegedly involved in the operation. (Id. at 45.)

Young's counsel objected to this testimony, arguing that it went "beyond the stated purpose

for his testimony." (Id. at 46.) The court overruled the objection and Agent Glasgow

provided additional detail on the "bust out scheme." (Id. at 46-47.)

Glasgow's testimony also indicated that the companies were able to obtain credit by

vouching for each other on Dun and Bradstreet (id. at 49), and that Glasgow had met with

Loomis and discussed the "bust out scheme." (Id. at 50.) Loomis did not give a formal

statement to Glasgow, but Glasgow created an FD-302 form as a result of his investigation. (Id.)  The prosecution presented Glasgow with a copy of the FD-302 concerning his investigation.  (Id. at 51.)  Young's counsel objected, arguing that the FD-302 form was hearsay.  The prosecution countered that the testimony went to motive.  (Id.)  Agent Glasgow indicated that the information came directly from Loomis and the court overruled the objection.  (Id.)

Agent Glasgow testified that Loomis stated he worked for Young and provided the aliases Young used.  Loomis was asked by Young to run a store in Pittston and the store was to be used "as a drop point for storage of merchandise that were [sic] ordered by other stores" and "Young was the mastermind behind this operation."  (Id. at 54-55.)  Loomis explained that the businesses would purchase merchandise from trade shows, have the merchandise delivered, and then it would disappear out of the store and be fenced out of the area.

The prosecution also asked Agent Glasgow whether his investigation had uncovered any checks issued to Young from Louis Masgay.  (Id. at 58.)  Young's counsel objected. (Id. at 59.)[16]  The Prosecution agreed to limit his questioning to the amount of money received,

_____

[16] Defense counsel argued that the Pennsylvania Supreme Court's 1999 decision found that allowing Glasgow to testify about Masgay went beyond the scope of permissible testimony.  (Id. at 59.) The Supreme Court did not, however, decide that the testimony regarding Masgay was inappropriate, but instead held that the testimony regarding
(continued...)

and the court sustained the objection.  (Id.)

Cross-examination revealed that Loomis had never reviewed Agent Glasgow's FD-302, Loomis was afraid of being arrested, Glasgow could not remember the dates the grand jury was seated, Glasgow never served a grand jury subpoena on Mr. Loomis, no RICO indictments were brought against Young, and no money was recovered from the alleged "bust out scheme."  (Id. at 62-77.)  On re-direct, Agent Glasgow testified that during his investigation he discovered the positive credit ratings reported to Dun and Bradstreet were false and saw checks to Young from a Luzerne County individual totaling $200,000, and approximately $500,000 from an illegal enterprise in New York state. (Id. at 79.) On re-cross-examination, Agent Glasgow testified that he did not have access to any documentary evidence to support these statements.  (Id. at 80-81.)

At the close of testimony, Young's counsel requested a cautionary instruction informing the jury that they were not to consider Glasgow's testimony regarding Loomis's statements for the truth of the matter asserted.  (Id. at 82.)  The court granted this request:

> Members of the jury, I'd like to give you a cautionary instruction at this time. What Russell Loomis may have told to Mr. Glasgow is an exception to the hearsay rule . . . to show his state of mind and through that the motive of the defendant, but you can't take those statements made by Mr. Loomis as proof

---

[16](...continued)
information received from Masgay as to the value of the goods acquired in the bust-out scheme was not offered to prove the truth of the matter asserted, but instead was used to establish motive.  Commonwealth v. Young, 748 A.2d 166, 176 (Pa. 1999).

of whether or not Mr. Young committed a crime here. You can only consider
them in regard to that motive and Mr. Loomis' state of mind, but not to the
truth of what was said. What Mr. Loomis may have said does not go to the
truth to prove whether or not Mr. Young is actually guilty or not guilty. It goes
just for that limited purpose that you can ascertain motive and state of mind.

(Id.)

Following the first trial, the Pennsylvania Supreme Court held that Glasgow's FD-302

report was not offered to prove that Young "was involved in the bust out scheme, but to

establish Appellant's motive for killing Loomis, i.e., to prevent him from cooperating with the

FBI and testifying against Appellant before the federal Grand Jury. Accordingly, it was not

excludable hearsay." Commonwealth v. Young, 748 A.2d 166, 176 (Pa. 1999).

Following the 2003 trial, Young again argued the impropriety of Agent Glasgow's

testimony. (Ct. Com. Pl. Op., Dkt. 10-2, at 40.) The trial court referenced the Supreme

Court's earlier decision and determined the testimony was properly admitted. (Id.)

Additionally, the court instructed the jury that the evidence was not to be used for the truth of

the matter asserted, but only to provide motive for the homicide of Russell Loomis. (Id. at

43.) Accordingly, the court denied relief, finding that there was no hearsay violation.

The Superior Court also cited the Supreme Court's earlier decision and found that

the testimony was properly admitted, not "to prove the truth of the matter asserted," but "to

show motive." (Sup. Ct., Dkt. 9, at 11.) Furthermore, the court found that "any danger of

unfair prejudice was greatly diminished by the cumulative nature of this evidence – the

Commonwealth presented several eyewitnesses who testified to their firsthand knowledge of the inner workings of defendant's bust-out scheme."[17]  (Id.)  As the testimony was offered to prove motive and a specific limiting instruction was given to the jury, the appeals court held that Young's claims were meritless.

While the state courts analyzed the evidentiary issues surrounding the admission of Agent Glasgow's testimony, the courts failed to analyze whether there was any violation of Petitioner's constitutional rights.  Accordingly, with regard to the Sixth Amendment

---

[17]   The Court of Common Pleas Opinion stated:

Frank Golden testified about what he learned of Defendant's dealings with the bust out scheme from Mr. Loomis and the fears Mr. Loomis held. (NT, 6/27/03, p. 26-31); Joseph Brizinski testified from personal knowledge of his involvement with the Defendant in the bust-out scheme (NT, 6/27/03, pp. 95-111); Theresa Slick testified both from personal knowledge and statements made to her by Mr. Loomis about his involvement and fears (NT, 6/27/03, p. 123-150); Catherine Hull testified from her own personal knowledge and involvement with the Defendant (NT, 6/30/03, p. 21-31); Sal Bernardi testified from his own personal knowledge that, while employed as a law enforcement officer, he met the Defendant in the Lackawanna County Courthouse and informed him to remain there because there was a warrant for his arrest and, as a result, the Defendant ran (NT, pp. 178-184); Agent Daniel Glasgow testified about his investigation and statements made to him about Defendant by Mr. Loomis (NT, 6/27/03, pp. 43-61); Ronald Hull testified from his own personal experience about his involvement with the Defendant in the bust-out scheme (NT, 6/27/03, pp. 178-184); and Francis Zanin testified concerning the Defendant's alteration of appearance by way of fingerprint manipulation (NT, 8/25/95, pp. 74-75).

(Court of Common Pleas Opinion, Dkt. 10-2, at 40 (footnotes omitted)).

confrontation claim, <u>de</u> <u>novo</u> review is necessary.  <u>See</u> <u>Cone,</u> 129 S. Ct. at 1784.

It is Young's position that since he did not have the opportunity to cross-examine former-Agent Glasgow's sources, Agent Glasgow's testimony as to what his sources stated violated his Sixth Amendment confrontation right.  It is clear, however, that "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  <u>Crawford,</u> 541 U.S. 36, 59 n.9 (2004) (citing <u>Tennessee v. Street,</u> 471 U.S. 409, 414 (1985)).  "Nonhearsay use of evidence as a means of demonstrating a discrepancy does not implicate the Confrontation Clause." <u>Jimenez,</u> 513 F.3d at 81.  "[T]estimonial statements are admissible without prior cross-examination if they are not offered for their truth."  <u>United States v. Lore,</u> 430 F.3d 190, 209 (3d Cir. 2005).  "The Supreme Court's precedents establish that the Confrontation Clause does not protect a litigant from the introduction of an out-of-court statement where that statement is not offered for the purpose of proving its truth."  <u>United States v. Daniels,</u> 48 F. App'x 409, 414 (3d Cir. 2002).

The testimony given by Agent Glasgow was not hearsay because it was not offered for the truth of the matter asserted, and a proper limiting instruction was given to the jury on that point.  Accordingly, the confrontation clause was not implicated.  <u>See</u> <u>Crawford,</u> 541 U.S. at 59; <u>Jimenez,</u> 513 F.3d at 81; <u>Lore,</u> 430 F.3d at 209.

Furthermore, although Petitioner argues that his Fourteenth Amendment rights were

45

violated, he provides no support for the determination that his "federal due process rights and his Sixth Amendment right to a jury determination based on competent, reliable evidence" were violated.  (Br. Supp., Dkt. 23-2, at 15.)  Petitioner had ample opportunity to confront Agent Glasgow and cross-examine him during his 2003 trial.  Accordingly, neither Petitioner's Fourteenth nor Sixth Amendment rights were violated.

## F.  CLAIM SIX - TRIAL TRANSCRIPTS

Young's sixth claim is that during the 2003 trial, twenty-two transcripts of the 1995 trial, pre-trial proceedings, and a 1988 hearing were read without simultaneous transcription or recording.  (Pet., Dkt. 1, at ¶ 119.) The Court of Common Pleas allowed the testimony of certain witnesses who were either deceased or unavailable to be read into the record.  (Dkt. 10-2, at 76.)  The parties reached a compromise and allowed a law clerk to read the transcripts to the jury.  (Id.) The law clerk, the court, counsel for the Commonwealth, and Young all had copies of the transcripts so that they could read the questions and answers. (Id.)  Each party read the questions presented and the law clerk answered in his role as the unavailable witness.[18]  (Id.)  Young claims that during the presentation of the testimony,

---

[18] On behalf of the Commonwealth, testimony of the following individuals was read to the jury: Andrew Merenich; Francis E. Zanin; John White; Robert Arthur; Michael Bartosh; Beth Ann Fashauer; Roberta Young; Gary Litts; Patrick Tigue; Paul Nenish; and Frank Leschingski.  (Id.)  On behalf of Young, testimony from the following individuals was read: Frank Zanin; Carmen Talerico; William Sweeney; Theodore Kastawa; Lois Kastawa; Ann Marie Brizinski; John Moran; Frank Leschingski; and John Glatz.  (Id. at 76-77.)

objections made during the prior proceedings were renewed, and the trial court made new rulings. (Id.) Furthermore, he claims that "several transcripts were not read verbatim, but were, instead, amended during the retrial." (Pet. Br., Dkt. 23-2, at 18.) Accordingly, Young asserts that he was deprived of his federal due process rights, the right to effective assistance of counsel, and the right to equal protection, because the readings were not transcribed and included in the 2003 transcripts. (Id. at 19-20.) Young alleges that after his conviction he learned that the court reporters had not recorded or transcribed the testimony. (Id. at 77.) At a subsequent hearing regarding the issue, the law clerk testified that he could not recall any objections made during his reading. (Id.) The court denied Young's request for a new trial and "ordered that the transcripts which had been read from the previous trial be attached as exhibits to the transcript reflecting the testimony on the day it was read." (Id.) Furthermore, the court found that at no time during the reading of the transcripts was a request made by either party that the testimony be re-recorded by court reporters, nor were objections made that error had occurred in the reading of the transcripts. (Id. at 77.)

Young argued that he was deprived of appellate review because a full or equivalent picture of the 2003 trial proceedings did not exist. (Id.) The court found that Young had failed to establish: (1) that the lack of record or "equivalent picture" was not his fault; and (2) that there was a potentially meritorious claim which could not be adequately reviewed because of the deficiency in the transcript. (Id. at 77-78 (citing Commonwealth v. Anderson,

272 A.2d 877, 882 (Pa. 1971)).)  In applying the Anderson test, the court noted that Young did not request that the readings be transcribed and there was no deficiency in the record because "[t]he transcripts from previous proceedings reflect that which was read, without any objection regarding error, to the jury."  (Id.) Furthermore, the Court found that Young had "failed to cite any issue, meritorious or otherwise, which cannot be addressed by our appellate courts" based on the failure to re-transcribe the testimony.  (Id.)

The Superior Court adopted the trial court's findings and concluded that Young's claim was "devoid of merit" because Young had been provided with an equivalent picture of the proceedings.  (Dkt. 9, at 12 (citing Commonwealth v. Marshall, 812 A.2d 539, 551 (Pa. 2002)).)  Because Young asserted thirty-one claims in post-sentence motions and forty-two claims on his statement of matters complained of on appeal, the court reasoned that Young had "not been provided with a deficient record . . . nor is the record inadequate for appellate review."  (Id. at 12-13.)

Young's claims were properly presented and adjudicated by the state courts.[19] Accordingly, this Court will employ a deferential standard of review.  Young cites to Draper

---

[19] In Draper v. Washington, 372 U.S. 487 (1963), the Court held "a defendant must be furnished a full transcript or other equivalent picture of the trial proceedings so that his right to appeal will not be an empty or illusory right."  Although the federal standard does not use the Anderson two-pronged test relied on by the state courts, the standards do not contradict one another because they both concern whether the defendant has been furnished with an "equivalent picture" of the trial proceedings.

48

v. Washington, 372 U.S. 487 (1963); Bounds v. Smith, 430 U.S. 817, 822 (1977), Eskridge v. Washington State Board of Prison Terms and Paroles, 357 U.S. 214 (1958), and Griffin v. Illinois, 351 U.S. 12 (1956), in support of his position that the state court decisions violated clearly established federal law. (Pet. Br., Dkt. 23-2, at 19.) Each of these cases, however, is distinguishable. Bounds concerned the establishment of law libraries in prison units and held that "'adequate and effective appellate review' is impossible without a trial transcript or adequate substitute," and thus, "States must provide trial records to inmates unable to buy them." 430 U.S. at 822. In Eskridge, the Court concluded that it was improper to refuse to furnish a transcript of trial proceedings to an inmate who could not afford the expense. 357 U.S. at 216. Similarly, the Court in Griffin held that "[d]estitute defendants must be afforded as adequate appellate review as defendants who have enough money to buy transcripts." 351 U.S. at 19. In Draper, the Court emphasized that there must be "an equivalent report of the events at trial from which the appellant's contentions arise." 372 U.S. at 495. In this case, it is evident that there was an adequate record upon which Young could premise his claims. Accordingly, Young has failed to present any Supreme Court case showing that the state courts' decisions were contrary to, or involved "an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Furthermore, the facts as articulated do not support the contention that the state courts' analyses "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence." <u>See</u> 28 U.S.C. § 2254(d)(2).  Young provides no evidence that he requested the court reporters transcribe the testimony, has provided no evidence that he objected when the court reporters did not transcribe the readings, has provided no evidence as to how the readings were altered from the transcripts provided to all parties at the 2003 trial, and has provided no evidence to support a conclusion that he was not given an "equivalent picture" of the trial based on the earlier transcription.  Accordingly, the state court decisions are not an unreasonable application of the facts in light of the situation, and Young's claim that his Sixth and Fourteenth Amendment rights were violated is without merit.

### G.  CLAIMS SEVEN AND EIGHT - RANK HEARSAY AND SPECULATION

Young's seventh and eighth claims are that his Sixth and Fourteenth Amendment rights were violated because the prosecution presented hearsay and contradictory evidence. The bases of Young's claim is that Ronald Hull was the only witness who could connect Young to the murder, that there was no additional direct evidence connecting him to the murder, and that Hull's testimony was unreliable, inconsistent, and did not amount to competent evidence.  (Pet. Br., Dkt. 23-2, at 25.) Young contends that the prosecution did not prove his guilt beyond a reasonable doubt because the only "purported evidence directly connecting Petitioner to this crime came from Ronald Hull," and his testimony "was riddled with contradictions and inconsistencies, including contradictions on whether or not he was

even present when the murder occurred." (Id. at 24.)  Young lists other evidence supporting

his innocence, including the circumstances of Harold Litt's identification and forensic

evidence that the shooting did not occur as Hull claimed, and that Loomis's body could not

have been at the scene before April 12, 1979.  (Id. at 25.)

In a lengthy recitation of the facts supporting Young's conviction, the Lackawanna

County Court of Common Pleas combined claims seven and eight and found that "[t]he

Defendant was afforded the opportunity to cross-examine each and every witness and to

challenge the evidence provided by the Commonwealth." (Ct. Cmn. Pl., Dkt. 10-2, at 31.)[20]

---

[20]  The court reiterated that there were numerous facts to corroborate Hull's
testimony, including physical evidence.   The court discussed motive, in that Hull and
Loomis were called before a grand jury and Hull was advised by Young to assert his Fifth
Amendment rights and that Hull had been advised by Cornell, Slick and Young that
something had to be done with Loomis before he spoke to authorities. (Ct. Cmn. Pl., Dkt.
10-2, at 26-31 (citing NT, 6/30/03, p. 53).) There was testimony that Young asked Paul
Nenish to get a firearm that could not be traced and also purchased a Jeep from Nenish. (Id.
(citing NT, 6/30/03, p. 54-55).) Hull testified that he went scouting for a place to dispose of
the body (id. (citing NT, 6/30/03, p. 59), and on the date of the murder met Slick, Cornell,
Loomis, and Young to try to remove the Jeep from the mud.  (Id. (citing NT, 6/30/03, p. 63).)
At the site, Cornell pointed to a hole, indicating it was Loomis's grave (id. (citing NT, 6/30/03,
p. 66)), and while Loomis attempted to cross a stream towards the Jeep, Young pulled a
gun and shot 2-3 times.  (Id. (citing NT, 6/30/03, p. 68-69).)  After Loomis was shot, he
turned and walked back towards Hull and Young exclaiming, "you f__kers!" (Id. (citing NT,
6/30/03, p. 69).) At which point, Cornell took the gun from Young and shot Loomis two (2)
more times.  Id. (citing NT, 6/30/03, p. 69). The men tried to remove Loomis's body from the
stream but were unable to do so.  (Id. (citing NT, 6/30/03, p. 70).)  They left Loomis in the
stream, removed the Jeep and while leaving the muffler gave way, which according to Hull,
he fixed.  (Id. (citing NT, 6/30/03, p. 70-71).)  Hull also recalled that while fixing the muffler a
car had driven by.  (Id. (citing NT, 6/30/03, p. 72).)  In addition to Hull's testimony Paul

(continued...)

51

The Superior Court opinion found:

> the record demonstrates that even disregarding Hull's testimony in its entirety
> for the sake of argument, the corroborating testimony of additional witnesses
> and physical and circumstantial evidence submitted in this case more than
> adequately supported defendant's conviction.

---

[20](...continued)
Nenish testified that he was hired by Young to run the Childs' store and that he sold a Jeep
to Young that he never saw again. (Id. (citing NT, 7/2/03, p. 53-56).) Nenish testified that
he last saw Loomis alive on April 11, 1979, the Wednesday before the first day of trout
season. (Id. (citing NT, 7/2/03, pp. 59, 61-62).) Nenish recalled that, when he last saw him,
Loomis was with Young and they were looking for chains to get something "unstuck". (Id.
(citing NT, 7/2/03, p. 62-63).) Nenish also testified that he sold Cornell a Ruger Blackhawk
357 firearm that he never saw again. (Id. (citing NT, 7/2/03, p. 65).) Halupke testified that he
went into business with Young and was subpoenaed before a grand jury and was told by
Young to try to avoid testifying and to plead the Fifth Amendment if necessary. (Id. (citing
NT, 6/26/03, p. 122-27).) There was testimony that Young had been told that Loomis was
selling merchandise from the store at a local bar and Young replied that they would "get
him." (Id. (citing NT, 6/25/03, p. 128).) Halupke testified that he too helped search for a site
to bury Loomis's body and that Young did not want to bury him in the stripping pits because
he feared that the body would be discovered. (Id. (citing NT, 6/26/03, p. 129).) Harold Litts's
testimony revealed that on April 11, 1979, at about 7:30 - 8:00 p.m., he and his brother
heard what he identified as screaming and the sound of either firecrackers or gunshots.
(Id. (citing NT, 7/1/03, p. 126).) Harold saw a Ford on the side of the road with people
working on it and identified Young as one of the men with the car. Id. (citing NT, 7/1/03, p.
137).
         The trial court determined that this evidence:

> sufficiently corroborated and supported the testimony of Ronald Hull to place
> this matter outside the realm of those cases cited by the Defendant and the
> principle discussed therein. Comparison of this testimony reveals that Ronald
> Hull's testimony did not stand alone and was not so contradictory with other
> corroborating evidence that the jury was required to either speculate or guess.

Id.

(Sup. Ct. Op., Dkt. 9, at 13.)  The Superior Court observed that the jury, although afforded the opportunity to believe all, part, or none of the evidence, "credited Hull's eyewitness testimony as well as the additional, substantial corroborating evidence . . . ."  (Super. Ct. Opp., Dkt. 9, at 13-14.)  The appeals court determined "that the evidence was more than sufficient to support the conviction." (Id.)

Young's state court briefs sought relief pursuant to the Fifth and Fourteenth Amendments.  In his claim to this Court, Petitioner seeks relief pursuant to the Sixth and Fourteenth Amendment in claim seven, as opposed to the Fifth and Fourteenth Amendments. (See Sup. Ct. Br., Dkt. 10, at 66-67.)  Young's claim pursuant to the Sixth Amendment, accordingly, does not appear properly exhausted.  Young's claim of a Fifth Amendment violation in claim eight is also without merit.

The Fifth Amendment claim was properly presented and adjudicated in the state courts.  While the state courts did not identify federal standards, the standards they employed do not contradict federal law.  "[A] state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." Jackson v. Virginia, 443 U.S. 307, 321 (1979). Under federal law, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Id. at 319. This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The Jackson standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction." Schlup v. Delo, 513 U.S. 298, 330 (1995). "[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). This standard is consistent with the standard employed by the state courts.[21] Accordingly, the Fifth Amendment claim will be reviewed using the statutorily mandated deferential standard

---

[21] Pursuant to state law, "[t]raditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. . . . [T]here is surely no justification for an appellate court, relying solely upon a cold record, to exercise such a function." Commonwealth v. Farquharson, 354 A.2d 545, 550 (Pa. 1976) (citations omitted). "On appellate review of a criminal conviction, we will not weigh the evidence and thereby substitute our judgment for that of the finder of fact. To do so would require an assessment of the credibility of the testimony and that is clearly not our function." Id. (citations omitted). But, "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." Id. (citing Commonwealth v. Bennett, 303 A.2d 220 (Pa. Super. Ct. 1973)). To prove entitlement to relief, "the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason." Id. "The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses." Commonwealth v. DeJesus, 860 A.2d 102, 107 (Pa. 2004); see Commonwealth v. Simmons, 662 A.2d 621 (Pa. 1995). Differences in accounts between witnesses that are contradictory "are not sufficient to render their testimony mere conjecture or render it unreliable." DeJesus, 860 A.2d at 107.

54

of review.  See 28 U.S.C. § 2254(d).

Young has not articulated, nor has this Court uncovered, any Supreme Court case that is contrary to the state courts' findings.  The case law cited by Young, In re Winship, 397 U.S. 358 (1970), and Jackson v. Virginia, 443 U.S. 307 (1979), are not contrary to the state court's finding.  Moreover, the Court's holding in Jackson, 443 U.S. 307, that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," is not contrary to the state courts' determination that "[t]he question of credibility is left to the jury and the verdict will not be disturbed if the jury determines the evidence is worthy of belief."  Jackson, 443 U.S. at 326; (Ct. Cmn. Pl., Dkt. 10-2, at 25.) Accordingly, Young does not present a viable claim that his conviction was not supported by adequate evidence.

Furthermore, the state courts' determinations were not based on an unreasonable determination of the facts in light of the evidence presented.  The state court pointed to a plethora of evidence supporting a finding of guilt.  (See Ct. Cmn. Pl., Dkt. 10-2.)  Petitioner was able to conduct a thorough cross-examination of Ronald Hull.  This cross-examination revealed that Hull had been convicted of numerous crimes, that he lied when he spoke to the police between 1979 and 1991, and that he lied to the grand jury.  (NT, 6/30/03, at 113-

20.) It is not this Court's role to determine the credibility of witnesses, see Schulp, 513 U.S. at 330; that task is rightly left to the trier of fact. The state courts' recitation of the evidence shows that there was ample evidence, if believed, to warrant a guilty verdict. Young has not shown that the state court decisions rest on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to relief on his seventh and eighth claims.

## H. CLAIM NINE - HAROLD LITTS'S TESTIMONY

Young's ninth claim is that his Sixth Amendment rights were violated as a result of Harold Litts's identification testimony. Young alleges that Harold's identification was improperly based on a photo array of five pictures, two of which were of Petitioner, with one being a mugshot marked with tape. (Pet. Br., Dkt. 23-2, at 35.)

Based on what Harold saw on the night of April 11, 1979, the police tried numerous times to have him identify the persons he saw in the road near his house. On October 4, 1985, Harold was attempting to leave Lane's Garage when Trooper Leschingski blocked his exit. (Id. at 134.) The trooper identified himself, put photos on the trunk of the car for Harold to identify, and after identifying Slick, asked Trooper Leschingski to leave because he did not want to be bothered. (Id.) Harold was unsure of whether he could identify any other individuals and indicated that he did not want to be bothered any more.[22] Over six years

---

[22] At trial, Harold Litts testified: "I didn't want to be bothered. I don't want to be bothered now." (NT, 7/1/2003, at 134.)

later, on February 8, 1992, Harold was asked to appear at the Pennsylvania State Police barracks. (Id. at 134.) Harold brought his lawyer with him because he wanted to be left alone. (Id. at 135.) He agreed to do a photo lineup, identified Slick, left the room to confer with his lawyer, and then identified Young. (Id.) At trial, Harold again identified Young as one of the men standing by the car that night.

Harold was extensively cross-examined at trial by Young's counsel. On cross-examination he admitted that it was dark when he drove by the vehicle, but when he drove by the vehicle he wanted to know "who they were and what they were doing," and thus he drove by slowly. (Id. at 140, 143.) Harold made eye contact with two of the men and was unsure if there were more people. (Id. at 145.)

Young's counsel questioned Harold about only identifying Slick after the initial photo array, to which Harold responded: "I didn't want to be here. I didn't want nothing to do with this when I found out what it was about. I wasn't going to give any information out that I didn't have to." (NT, 7/1/03, at 147.) He stated that he identified Slick and then left the room to talk to his attorney because he knew two people but did not want to be bothered, to which his attorney told him he better explain to the officers who he saw and tell them. (Id.) Harold indicated that he wasn't going to tell them and wanted the whole incident to be over. (Id. at 154.) Harold ultimately identified Young as the man standing next to Slick behind the trunk of the car. When describing the men next to the car, Harold testified: "I probably

wouldn't have paid attention to the men if one didn't step out like that. He was huge. I mean, the guy had a sweat shirt. His chest stretched the shirt. It catches my eye." (Id. at 151.) Harold stated that he was looking right at them as he came up the hill because his concern was identifying who they were and what they were doing. (Id. at 152.) During cross-examination the following exchange took place:

> Q.    And speaking of a long time, between April of '79 and February 8th of '92 is about 13 years, correct?
> A.    Uh-huh.
> Q.    And you picked out someone that you observed for the time it takes you to pass the distance that your headlights showed; is that correct?
> A.    You're saying 13 years later I picked the man out again?
> Q.    I'm sorry. You identified someone 13 years later?
> A.    What do my remarks say about it 13 years later?
> Q.    I think you and I were saying it's a long time ago.
> A.    What did my remarks say when I picked him out 13 years later? I remember saying something about somebody lost some weight and things like that.
> Q.    Well, would you agree with me it was 13 years later?
> A.    That's a good time frame to agree with.

(NT, 7/1/03, at 154-56.) At a later point in the cross-examination, Young's counsel again reiterated the length of time between the event and Harold's identification:

> Q.    You picked him out 13 years later after you had several opportunities to, A., tell the troopers a description of the person?
> A.    No, I picked him out after the incident was there. It wasn't 13 years later I picked out those pictures. They haunted me for weeks after that coming to my house, following me down the road.

(NT, 7/1/03, at 161.)

In Young's closing arguments the accuracy of the identification was called into doubt

by defense counsel:

Harold Litts, he identifies Richard Young after – 13 years after the fact from an array of five photographs.  Two of them are Richard Young.  He's seen them before.  When he initially sighted this person it was dark.  He's indicated these are people that he didn't know before.  He got only a glimpse of the person by the side of the car who 13 years later turned out to be Richard Young.  Two of the four people in this array were Richard Young.  He failed to identify Richard Young from some of the same photographs.

Those two photographs and the other three that were shown to him in '92 were also shown to him by Trooper Leschingski in 1985.  Trooper Leschingski testified by transcript about that.  He told Trooper Carlson on April 14, 1979, I did not get a good look at these guys.  But we're supposed to believe him.

(Closing Argument, NT 7/11/03, at 34.)

In its instructions to the jury, the court included an identification instruction:

Identification testimony must be accepted with caution if the witness, because of bad position, poor lighting or the like, did not have a good opportunity to observe the actor or when the witness refused to view or failed to identify the actor from a lineup.

If you believe that one or more of these factors are present you must consider the testimony of Harold Litts identifying the defendant with caution.

If you believe none of these factors are present, then you need not receive the testimony with caution.  You may treat such testimony like ordinary testimony.  That is, as a statement of fact.

(NT, 7/11/03, at 110.)

Young raised the identification issue following his first trial.  The 1999 Pennsylvania

Supreme Court ruling was as follows:

At trial, Harold Litts identified Appellant as one of the men he saw on the night of the murder.  Appellant argues that this testimony should have been excluded because it was the product of an unduly suggestive photo array.

59

This argument is without merit. Litts was shown an array of five photographs, two of which were Appellant. One of the photographs of Appellant was a mug shot with a piece of tape over the police identification numbers. These circumstances in no way indicate that the photo identification procedure was unduly suggestive.

Commonwealth v. Young, 748 A.2d 166, 178 (Pa. 1999) (citations omitted).

Following the 2003 trial, the Lackawanna County Court of Common Pleas found that since Young had failed to present new evidence, or allege a change in the law, the court was bound by the Pennsylvania Supreme Court's 1999 decision and declined to suppress the identification. (Ct. Cmn. Pl., Dkt. 10-2, at 32.) Furthermore, the court cited state and federal law supporting the earlier decision. (Id. at 32-33.) The court recognized that Harold's identification of Young did not occur until 13 years after the crime, that only five photographs were shown, that two of the photographs were of Young, and that one of those photographs was a mug-shot with tape over the identification number. (Dkt. 10-2 at 31-33.) The court, however, further noted that Harold had an independent basis for his identification:

> Mr. Litts was not a mere bystander. On April 11, 1979, he went out to the location of the vehicle attended by the Defendant and Mr. Slick with the specific intention of finding out what they were doing and who they were. . . . Mr. Litts was 'looking' to see who was on Ashton Mountain Road and if they were stealing his gasoline. Though he may have only viewed the Defendant and Mr. Slick for a short period, he was aided not only by his specific intention to identify, at the time for himself and his brother, those on the road; but also, he was aided by the light emanating from the trunk of the Defendant's vehicle, as well as his headlights on his mother's Ram Dodge, which were shining in the direction and upon the location of Mr. Slick and the Defendant. The fact that Mr. Litts did not want to be involved in the present matter and cooperate fully with the State Police, does not detract from the existence of the

independent basis for identification of the Defendant.

(Id. at 33 n.6.)  Accordingly, the court found that suppression was not appropriate.

The Pennsylvania Superior Court also rejected Young's claim, quoting from the 1999 Supreme Court decision that the law had not changed and new evidence had not been presented, and thus it was appropriate to admit the identification.  (Super. Ct. Op., Dkt. 9, at 14.)  The court found:

> To the extent that defendant takes issue with the delay in Litts' identification of him, it is plain from the record that Litts did not want to participate in the prosecution because he thought it would be financially burdensome to his business.  Regarding defendant's allegation that the conditions on the evening of the incident were less than optimal, we note that the trial court in an exercise of prudence granted defendant's request for a Kloiber instruction to the jury, see Commowealth v. Kloiber, 106 A.2d 820 (Pa. 1954); N.T. 7/11/03, 109-110, and did so despite our Supreme Court's ruling that such an instruction was not necessary under the circumstances of this case.  See Commonwealth v. Young, 748 A.2d at 181-182.

(Super. Ct., Dkt. 9, at 15 n.7.)

Young's claim was fairly presented and properly adjudicated by the state courts.[23]

--------

[23] Reliance on a decision made at a prior stage of the litigation is an adjudication on the merits, and a habeas court should examine the opinion on direct appeal and on collateral review to determine if the adjudication was reasonable.  Boyd v. Waymart, 579 F.3d 330, 336 (3d Cir. 2009) (Scirica, C.J., concurring).
The cases cited by the Pennsylvania Supreme Court in its 1999 decision, Commonwealth v. Moore, 633 A.2d 1119 (Pa. 1993) and Commonwealth v. Patterson, 572 A.2d 1258 (Pa. Super. Ct. 1990), are not inconsistent with the federal standard.  In Moore, the court held: "In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of
(continued...)

Accordingly, a deferential standard of review will be employed.

Young has failed to cite, nor has this Court uncovered, any Supreme Court case "contrary to" this holding. See 28 U.S.C. § 2254(d)(1). Petitioner avers that

> [c]learly established federal due process law precludes the admission of identification testimony that arises out of identification procedures which are unnecessarily suggestive and create a substantial likelihood of irreparable misidentification. Manson v. Braithwaite, 432 U.S. 98, 106 (1977). See Stovall v. Denno, 3[8]8 U.S. 293, 301-302 (1967) (recognizing that where an accused is subjected to an identification procedure that was so unnecessarily suggestive and conducive to irreparable mistaken identification," federal due process is violated).

(Dkt. 23-2, at 33.) In further support for his claim, Petitioner cites United States v. Wade, 388 U.S. 218, 228 (1967), Simmons v. United States, 390 U.S. 377, 383-384 (1968), and

---

[23](...continued)
photographic identification which creates a very substantial likelihood of irreparable misidentification." Moore, 633 A.2d at 1125. In Patterson, the court determined that:

> Suggestiveness in an identification procedure can be determined from the totality of circumstances, which is analyzed by reviewing the opportunity of the witness to view the perpetrator during the crime, the accuracy of his description, the certainty that he demonstrated at the time of the identification, any prior misidentification, the manner in which the identification was conducted.

Patterson, 572 A.2d at 1266. The standard established by the Supreme Court is consistent with the standard employed by the state courts: "[C]onvictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on the ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Neil v. Biggers, 409 U.S. 188, 196-97 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

Neil v. Biggers, 409 U.S. 188, 199 (1972).  Each of these cases, however, is distinguishable and is not contrary to the state courts' findings.[24]

Furthermore, the state courts' decisions are not based on an unreasonable application of the facts in light of the evidence presented at trial.  The courts recognized that there was a significant delay between the event and Harold's identification, that the viewing

_____

[24] In Simmons, six photographs, mostly group photographs were presented to the witnesses and the Defendant appeared in several of the photographs.  390 U.S. at 385. The Court found that facts surrounding the identification procedure did not deny the Defendant due process.  Id.  In Manson, a photographic identification of the defendant took place after viewing one photograph of the defendant two days after the crime.  Manson v. Brathwaite, 432 U.S. 98, 115-16 (1977).  The Court found that the facts surrounding the identification supported the reliability of the identification, and thus the admission did not violate the defendant's due process rights.  Id. at 117.  In Stovall, the defendant was brought into the victim's hospital room with the officers, without any other suspects, and was identified by the victim.  Stovall v. Denno, 388 U.S. 293, 302 (1967).  The Court found that under the circumstances a police station line-up was not possible and that the victim's identification did not violate the defendant's due process rights.  In Wade, the defendant was identified in a line-up without his counsel present and was again identified by witnesses at the time of trial.  United States v. Wade, 388 U.S. 218 (1967).  The Court vacated the conviction and remanded the issue to the district court to determine whether the in-court identification was based on an independent source other than the line-up.  Id. at 242.  In Biggers, the victim was shown between 30 and 40 photographs of suspects over a seven month period but did not identify any of them as her attacker.  Biggers, 409 U.S. at 194-95. Police officers arrested defendant, who fit the victim's description of her attacker, but officers were unable to construct a suitable line-up.  Id.  Accordingly, the detective walked the defendant past the victim and at the victim's request directed him to say "shut up or I'll kill you."  Id.  The Court found that there was no substantial likelihood of misidentification, that the evidence was properly allowed to go to the jury, and that consequently, Bigger's due process rights had not been violated.  Id. at 201.  Accordingly, as none of the cases cited by Petitioner involve factual questions similar to the present facts, Petitioner's citation to these cases for the proposition that the result in his case is "contrary to" Supreme Court case law is unpersuasive.

conditions were not optimal, that only five photographs were shown, that two photographs were of Petitioner, and that one of the pictures was a mugshot. The Court identified the facts in Young's favor and those in the Government's favor, ultimately determining that the identification did not violate Petitioner's rights. The state courts' conclusion that the identification process was not unduly suggestive is entitled to deference. See Joseph v. Mee, No. 09-3891, 2010 WL 3035130, at *10 (D.N.J. Aug. 3, 2010); Perry v. Varano, No. 09-cv-02795, 2010 WL 2898791, at *18-19 (E.D. Pa. July 19, 2010). Accordingly, Petitioner is not entitled to relief on Claim Nine.

## I. CLAIM TEN - DATE OF THE OFFENSE INSTRUCTION

Young's tenth claim is that the jury instruction that guilt could be found even if the prosecution failed to prove the murder occurred on April 11, 1979, violated his Sixth and Fourteenth Amendment rights. During Petitioner's 2003 trial, the court instructed:

> You are not bound by the date alleged in the information, which is April 11, 1979. It is not an essential element of the crime charged. You may find the defendant guilty if you are satisfied beyond a reasonable doubt that he committed the crime charged in the information even though you are not satisfied that he committed it on the particular day allege [sic] in the information.

(NT 7/11/03, at 130-31.) Although the instructions stated that the information alleged April 11, 1979, the information filed against Petitioner on May 8, 1992, charged Young with murder-first degree, murder-third degree, criminal solicitation, and criminal conspiracy, occurring "on or about the 11th day of April, 1979 . . . ." (Young Information, 5/8/92, at 1-2.)

During the course of the trial, the Commonwealth's evidence, including the testimony of witnesses Hull and Litts, indicated that the murder occurred on the evening of April 11, 1979. Young presented expert testimony from an entomologist that Loomis's "body could not have been at the location before April 12, 1979," and testimony from witnesses who had seen the decedent alive after April 11, 1979. (Dkt. 23-2, at 41.) John Hope testified that although he had filed an affidavit stating he had seen Loomis alive on April 13, 1979, the affidavit was a lie and he had been serving time in jail on April 13, 1979. (NT, 7/2/03, at 89-108.) Young does not specify other evidence supporting the assertion that Loomis was alive after April 11, 1979.

Young challenged the jury instruction on the date of the offense during his appeal from the 1995 verdict. The Pennsylvania Supreme Court held:

> In general, the Commonwealth need not prove that the crime occurred on the date alleged in the indictment, except where the date is an essential issue in the case, e.g., where the defendant presents an alibi defense. See, e.g., Commonwealth v. Boyer, 216 Pa. Super. 286, 264 A.2d 173 (Pa. Super. 1970). Here, Appellant did assert an alibi defense, but the Commonwealth completely eviscerated the testimony of Appellant's two alibi witnesses, John Hope and Patrick Tigue. Hope recanted his alibi testimony, and the Commonwealth proved that Tigue was in jail at the time he claimed to be with Appellant. Accordingly, the trial court did not err in instructing the jury that they could find Appellant guilty even if they found that the murder took place on a date other than that alleged in the indictment.

Commonwealth v. Young, 748 A.2d 166, 182 (Pa. 1999);(Dkt. 10-2, at 97).

During the 2003 trial, Young's counsel again objected to this jury instruction, but to

no avail. (NT, 7/11/03, at 144.) The trial court relied on Commonwealth v. Boyer, 264 A.2d 173 (Pa. Super. Ct. 1970), for the holding that the date was only an essential issue when the defendant presents an alibi defense, and additionally found:

> Aside from the presentation of an alibi defense, other reasons may exist to find that the actual date is critical, for example: where the lack of actual specificity may preclude the accused from attacking the credibility or story of the complainant. See Commonwealth v. Devlin, 333 A.2d 888, 891 (Pa. 1975).

(Dkt. 10-2, at 54.) Specifically the court noted:

> Prior to his trial in 1995, the Defendant filed a Notice of Alibi, albeit pro se, thus asserting that he could not have committed the crime as alleged on the date indicated. As we have previously expressed, in this re-trial, the Commonwealth pursued the same line of attack as it had in 1995. Again, and as the Supreme Court recognized in the first direct appeal, the Commonwealth eviscerated the Defendant's alibi. First, through the live testimony of John Hope, who recanted an Affidavit providing support that Russell Loomis was alive on April 13, 1979. (NT, 7/2/03, p.94). Second, through the testimony of Patrick Tighe [sic], which was read into the record and, consequently, was the same as that rendered in 1995. (NT, 7/2/03, p. 167). Otherwise, Defendant did not provide any other "alibi" proffers. Having once again punched holes in the Defendant's alibi, an exact date was not critical to nor did lack thereof prejudice the Defendant by depriving him of an alibi.

(Dkt. 10-2, at 54-55.) The court distinguished Young's case from Devlin, finding that here Young was faced with a small window of only four (4) days for the commission of the murder, as opposed to the extended period in Devlin. (Id. at 55.) The court also cited Commonwealth v. Robinson, 462 A.2d 840, 842 (Pa. Super. Ct. 1983), for the proposition that the Commonwealth did not always need to prove the specific date of the crime. (Id.)

The court noted that Young had presented witnesses indicating that they saw Loomis alive after April 11, 1979, the credibility of those witnesses was tested by the Commonwealth, and attacks on the credibility of these witnesses became a question for the jury. (Id.) Accordingly, the court found no error and denied relief. (Id.)

The Superior Court denied Petitioner's claim for relief, citing the Pennsylvania Supreme Court's 1999 findings, and adding:

> At defendant's 1995 trial, John Hope was presented as a hostile witness to the Commonwealth. However, at the 2003 trial, Hope was not a hostile witness. Hope stated that defendant had him prepare a fraudulent affidavit prior to the 1995 trial for the purpose of trying to show that the victim was alive after April 11, 1979. The affidavit essentially stated that Hope had met Loomis on April 13, 1979 to make a drug deal. Hope not only recanted the affidavit, but testified that defendant himself provided Hope the information to include in the affidavit. See N.T. 7/2/03, 89-96. Thus, defendant had no viable alibi. For this reason, in addition to those expressed in the trial court's opinion, defendant's claim fails.

(Sup. Ct., Dkt. 9, at 16.) Young's federal claims were adjudicated in the state court proceedings and this Court will employ a deferential standard of review.

Petitioner argues that the state court decisions are contrary to and involve an unreasonable application of federal law, citing California v. Trombetta, 467 U.S. 479, 485 (1984); Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Washington v. Texas, 388 U.S. 14, 23 (1967); Davis v. Alaska, 415 U.S. 308 (1974); In re Oliver, 333 U.S. 257, 273 (1914); In re Winship, 397 U.S. 358, 364 (1970); Cage v. Louisiana, 498 U.S. 39 (1990); Osborne v. Ohio, 495 U.S. 103, 122-23 (1990); Carella v. California, 491 U.S. 263, 265 (1989);

67

Francis v. Franklin, 471 U.S. 307, 313 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979);

United States v. Gypsum Co., 438 U.S. 422 (1978); Morissette v. United States, 342 U.S.

246 (1952); and, United States v. Gaudin, 515 U.S. 506, 522-23 (1995). (Dkt. 23-2, at 42.)

While listing all these cases, Young provides no additional analysis on how these cases

apply to the facts at issue. Nevertheless, each of these cases is unpersuasive.[25]

_____

[25] In California v. Trombetta, 467 U.S. 479, 491 (1984), the Court concluded that "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial." The case did not involve jury instructions in any respect and held that even without the breath samples Defendant had ample opportunity to present a defense. Id. at 489.

In Chambers v. Mississippi, 410 U.S. 284, 302 (1973), the Court held that exclusion of critical evidence (the testimony of three witnesses) and the trial court's refusal to permit the defendant to cross-examine a witness, denied the defendant due process. The case did not involve jury instructions in any respect. In Washington v. Texas, 388 U.S. 14, 23 (1967), the Court held that the petitioner was "denied his right to have compulsory process for obtaining witnesses in his favor" because the defendant was denied the right to put on the stand a witness who could testify as to events that he had personally observed, and "whose testimony would have been relevant and material to the defense." The case did not involve jury instructions in any respect.

In Davis v. Alaska, 415 U.S. 308, 318 (1974), the Court held the petitioner was denied the right to effective cross-examination when the trial court refused to allow cross-examination of a State witness regarding the witness' juvenile police record. In In re Oliver, 333 U.S. 257, 273 (1914), the Court determined that the petitioner was denied procedural due process when he was charged, tried, and sentenced in an ultra-secretive proceeding before a "one-man grand jury." In In re Winship, 397 U.S. 358, 364 (1970), the Court held that the standard of proof of 'beyond a reasonable doubt' was required during the adjudicatory stage of a delinquency proceeding. In Cage v. Louisiana, 498 U.S. 39, 41 (1990), the Court found that language in a jury instruction for first-degree murder equating reasonable doubt with "grave uncertainty" and an "actual substantial doubt," was inappropriate as it allowed the jury to find guilt based "on a degree of proof below that required by the Due Process Clause." In Osborne v. Ohio, 495 U.S. 103, 108 (1990), the
(continued...)

68

Petitioner has failed to proffer any cases indicating that the state court decisions

were an unreasonable application of clearly established federal constitutional law.  This

[25](...continued)
petitioner's conviction for private possession of child pornography was reversed when the trial court failed to instruct the jury that the government must prove lewd exhibition and scienter as elements of his crime, as required by statute.  In Carella v. California, 491 U.S. 263, 265-66 (1989), the trial court gave "mandatory directions" that "directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses," and "relieved the State of its burden of proof" of proving every element beyond a reasonable doubt.  In Francis v. Franklin, 471 U.S. 307, 325 (1985), a defendant's due process rights were violated when the jury instructions created "a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent."  In Sandstrom v. Montana, 442 U.S. 510 (1979), the Court found that the defendant's constitutional due process rights were violated when the court's jury instructions may have been interpreted by the jury as establishing a conclusive fact or shifting the burden of persuasion.  These cases either do not involve jury instructions or involve failure of the trial courts to instruct the jury on the proper elements of the crime or the proper standard of proof.  That is not the case here.  The date of the crime was not an element of the crime, and the instruction in question did not impair the "beyond a reasonable doubt" standard.
In United States v. United States Gypsum Co., 438 U.S. 422, 435-36 (1978), the Court held that the defendant's state of mind or intent was an element of the crime and that the jury instruction had the prohibited effect of forcing the jury to rely on a legal presumption, and accordingly, the defendant was denied due process.  In Morissette v. United States, 342 U.S. 246, 274 (1952), the Court found that the question of intent, when an ingredient of the crime charged, is a question of fact that must be submitted to the jury, and the trial court cannot withdraw that question by issuing a presumption of intent in the jury instruction.  Again, these cases involve jury instructions on the specific elements of the crime, in both cases intent, not on facts surrounding the crimes.
Finally, Petitioner's citation to United States v. Gaudin, 515 U.S. 506, 522-23 (1995), is unpersuasive.  In Gaudin, the Court held that "a criminal defendant [has] the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged," and that the trial court's instruction did not allow the jury to determine the "materiality" of the defendant's false statements.  Id.  Yet again, this case involves elements of the crime itself, and accordingly is distinguishable.

Court's independent review has uncovered no case law that confronts a set of facts that are materially indistinguishable from those at hand. Federal courts have recognized that "[i]t is a general rule of law that where time is not an element of an offense, a variance between the date alleged and the date proved is not material and that proof of the commission of the crime on any day from the finding of the indictment, and within the statute of limitations, is sufficient." United States v. Krepper, 159 F.2d 958, 964 (3d Cir. 1946) (citing Ledbetter v. United States, 170 U.S. 606, 612 (1898) ("Ordinarily, proof of any day before the finding of the indictment, and within the statute of limitations, will be sufficient")). Petitioner's assertion that the state court decisions reflect an unreasonable determination of clearly established constitutional law is without merit. Accordingly, the state courts must have made an unreasonable determination of the facts in light of the evidence for Young to be entitled to relief.

There is no evidence that a jury charge on an alibi defense was requested and denied at the second trial. The information charging Petitioner with Murder-First Degree, Murder-Third Degree, Criminal Solicitation, and Criminal Conspiracy includes the language "on or about the 11th day of April, 1979," in each of the charges. (See Young Information, May 8, 1992, at 1-2.) The information did not clearly say that Loomis' murder occurred on April 11, 1979. The information itself gave Young notice that the offense was committed "on or about the 11th day of April 1979," so the charge was not limited to a

specific date. Petitioner's witnesses argued that they had seen Loomis alive after April 11, 1979, and an expert entomologist testified that the body could not have been at the location before April 12, 1979. (Dkt. 23-2, at 40-41.)  While the prosecution's witnesses each indicated that the murder occurred on April 11, 1979, the issue of resolving this conflicting evidence was properly committed to the jury.  The court did not permit the jury to find that the crime was committed on a date other than the date charged.  Young was on notice that the crime occurred on or about April 11, 1979.  Accordingly, the state courts' determination was not unreasonable in light of the evidence, and Young was not denied his Sixth or Fourteenth Amendment rights.

### J.  CLAIM ELEVEN - "BUST OUT" SCHEME EVIDENCE

Young's eleventh claim is that evidence of his alleged involvement in a "bust out" scheme was improperly admitted as motive evidence in violation of his Sixth and Fourteenth Amendment rights.  (Pet. Br., Dkt. 23-2, at 45.) In support of this claim he alleges his right to present a defense was violated, citing California v. Trombetta, 467 U.S. 479, 485 (1984), Chambers v. Mississippi, 410 U.S. 284, 294 (1973); his rights to confrontation and cross-examination were violated, citing Crawford, 541 U.S. at 43, Davis v. Alaska, 415 U.S. 308 (1974), Pointer v. Texas, 380 U.S. 400, 405 (1965), Mattox v. United States, 156 U.S. 237, 242-43 (1895); his right to have the case proven beyond a reasonable doubt was violated, citing In re Winship, 397 U.S. 358, 364 (1970), Cage v. Louisiana, 498 U.S. 39 (1990),

Osborne v. Ohio, 495 U.S. 103, 122-23 (1990), Carella v. California, 491 U.S. 263, 265 (1989), Francis v. Franklin, 471 U.S. 307, 313 (1985), Sandstrom v. Montana, 442 U.S. 510 (1979); and his right to a jury determination based on competent, reliable evidence was violated, citing In re Oliver, 333 U.S. 257, 273 (1914), Turner v. Louisiana, 379 U.S. 466, 472-73 (1965), Chandler v. Florida, 449 U.S. 560, 574 (1981), United States v. Gaudin, 515 U.S. 506, 514 (1995).  (Dkt. 23-2, at 46-47 (citation omitted).)  Young fails to provide any discussion as to how these cases apply to the facts in his case.  Nor has he shown that the admission of this evidence of motive resulted from an unreasonable application of Supreme Court precedents.  Having failed to show that the admission of evidence of the bust-out scheme was contrary to or involved an unreasonable application of federal law as established by our Nation's High Court, Petitioner is not entitled to relief on this ground.

## K.  CLAIM TWELVE - CONSCIOUSNESS OF GUILT

Young's final claim is that his statements to the police were improperly admitted as consciousness of guilt in violation of his Sixth and Fourteenth Amendment rights.  During trial the following evidence was presented as consciousness of guilt: (1) Young had spoken to Trooper Genova in August of 1979 and told him that he did not know how to run an investigation (NT 7/1/03, at 40-42); (2) Young approached Trooper Genova at the Wayne County Courthouse and told him that a "one-armed man" from Carbondale had committed the murder (NT 7/1/08, at 41); (3) on August 15, 1980, in a telephone conversation between

Trooper Genova and Young, Young advised that Loomis was involved in drug dealing in the Mount Pleasant area and that if they worked together they could solve Loomis's murder (NT 7/1/03, at 44); (4) at another meeting at the Wayne County Courthouse Young again asked Trooper Genova how the investigation was going and stated he had hired his own investigator, knew that a .357 Magnum handgun had been used, knew the weapon's location, but would not tell Trooper Genova because he did not trust him  (NT, 7/1/03, at 46-47); (5) on April 16, 1979, Young told Trooper James that Loomis was self-employed and did not know who Loomis worked with but that he should talk to Sergeant Scavo in the Carbondale Police because he had information about Loomis (NT, 7/2/03, at 53-61); (6) Young told Trooper James that he saw Loomis on April 11, 1979, at P.J.'s Diner between 12:30 and 1:00 p.m., that Loomis told him he had a large quantity of drugs to deliver, that he again saw him that day in Childs between 5:30 to 6:00 p.m., that Loomis told him he had killed a man in Buffalo, New York, that Loomis ran a gambling joint and employed a man named Ismo to sell drugs for him, and that he had heard that Sergeant Spencer of the Honesdale police was the contract killer who shot Loomis (NT 7/2/03, at 61-64); (7) Catherine Hull testified that after learning of Loomis's death she indicated that she wanted to attend the funeral, but that Young advised her to stay away from that place and wanted her and her husband to move to Narrowsburg, New York so they would not be involved in the investigation into Loomis's death  (NT, 6/30/03, at 28-29); (8) Gerard Curcerello, who

worked with Loomis, testified that on April 11, 1979, Loomis asked him if he would help him

get a Jeep that was stuck in the mud, but Young told him that he couldn't go with Loomis

(NT 6/26/03, at 87-90); and (9) on April 12, 1979, Curcerello questioned why Loomis was

not at work and Young responded that he had called in sick (NT 6/26/03, at 93-94).  The trial

court found that this evidence, along with Agent Glasgow's testimony, was relevant to show

consciousness of guilt.  (Ct. Cmn. Pl., Dkt. 10-2, at 60-63).  At the conclusion of the

evidence, a consciousness of guilt instruction was given.[26]

---

[26] The trial court instructed the jury as follows:

Now we get into this question of consciousness of guilt, flight or
concealment as showing.  There was evidence, including the testimony of Sal
Bernardi, which tended to show that Richard Young fled from the police in
December of 1980, over a year after the homicide of Russell Loomis.  The
credibility, weight and effect of this evidence is for you to decide.
Generally speaking, when a crime has been committed and a person
thinks he is or may be accused of committing it and he flees or conceals
himself, such flight or concealment is a circumstance tending to prove the
person is conscious of guilt.  Such flight or concealment does not necessarily
show concealment – consciousness of guilt in every case.  A person may flee
or hide for some other motive and may do so even though innocent.
Whether the evidence of flight or concealment in this case should be
looked at as tending to prove guilt depends upon the facts and circumstances
of the case, and especially upon the motive which . . .may have prompted the
flight or concealment.
. . . .
A little more on consciousness of guilt.  There was evidence, including
the testimony of troopers Genova and James, alleging that defendant Richard
Young made false statements and provided false information to police officers
about Russell Loomis' activity prior to his death, and about information

(continued...)

The trial court conducted a thorough analysis of Young's claim and found that the essence of his argument was that since "the Commonwealth did not possess a definitive statement from him that he was trying to mislead investigators, then any statement made by him concerning this matter should not have been admitted." (Dkt. 10-2, at 60.) The court held that to the extent that there was evidence that Petitioner attempted "to direct the investigation away from himself," as indicated by "the statements made by Defendant to Trooper James and Genova and Mr. Curcerello," the jury was entitled to regard it as indicative of a consciousness of guilt. (Id. at 63.) The decision cites a plethora of state

---

[26](...continued)
designed to mislead police officers into their investigation into Russell Loomis' murder. If you believe this evidence, you may consider it as tending to prove the defendant's consciousness of guilt.

Again, you are not required to do so. You may consider [and] weigh this evidence along with all the other evidence in the case. You may not find the defendant guilty solely on the basis of evidence of his consciousness of guilt.

There was evidence also, including the testimony of Jerry Curcerello, allegedly tending to show that defendant Richard Young attempted to influence Mr. Curcerello's recollection of the events involving Russell Loomis prior to his death. If you believe this evidence you may consider it as tending to prove the defendant's consciousness of guilt.

Again, you are not required to do so. You should consider and weigh this evidence along with all the other evidence in the case. You may not find the defendant guilty solely on the basis of evidence of his consciousness of guilt. There must be more evidence.

(NT, 7/11/03, at 120-26.)

cases on the consciousness of guilt standard.[27]

The Superior Court found no error in the trial court's ruling.  (Super. Ct. Op., Dkt. 9, at 16-17.) The constitutional claim was fairly presented and adjudicated by the state courts.[28]  Accordingly, a deferential standard of review will be employed.

Young has failed to cite any United States Supreme Court case that holds contrary to the admission of evidence in this case.  Instead, he argues that the prosecution's position

---

[27] Cases cited include: Commonwealth v. Berrios, 434 A.2d 1173 (Pa. 1981); Commonwealth v. Miller, 721 A.2d 1121 (Pa. Super. Ct. 1998); Commonwealth v. Myers, 200 A. 143, 146 (Pa. Super. Ct. 1938); Commonwealth v. Wagner, 556 A.2d 464 (Pa. Super. Ct. 1989); Commonwealth v. Karmendi, 195 A. 62, 65 (Pa. 1937); Commonwealth v. Carbone, 574 A.2d 584, 589 (Pa. Super. Ct. 1990); and Commonwealth v. Donnelly, 653 A.2d 35, 37 (Pa. Super. Ct. 1995).

[28] "Evidence of a defendant's flight is admissible to prove consciousness of guilt." United States v. Thomas, 322 F. App'x 177, 183 (3d Cir. 2009); see United States v. Fisher, 306 F. App'x 733, 735.  The court in Fisher found that the following jury instruction neither usurped the jury's fact-finding function nor was inaccurate or misleading:

> this conduct may indicate he thought he was guilty of the crime charged . . . .
> On the other hand, sometimes an innocent person may engage in such
> conduct for some other reason.  Whether or not this evidence causes you to
> find that the defendant was conscious of his guilt of the crime charged, and
> whether that indicates that he committed the crime charged, is entirely up to
> you as the sole judges of the fact.

Fisher, 306 F. App'x at 735.  "'While general denials of guilt later contradicted are not considered exculpatory statements, any other exculpatory statement which is contradicted by evidence at trial' permits the jury to infer consciousness of guilt from the demonstrably false alibi."  United States v. Nicholson, 176 F. App'x 386, 399 (4th Cir. 2006) (quoting United States v. McDougald, 650 F.2d 532, 533 (4th Cir. 1981)).  It is thus clear that the standard employed by the state courts does not contradict federal standards.

that his statements were false and showed consciousness of guilt, and the court's

instruction on consciousness of guilt, violated his Sixth and Fourteenth Amendment right to

have the prosecution prove every element of the offense beyond a reasonable doubt, citing

In Re Winship, 397 U.S. 358 (1970); Taylor v. Kentucky, 436 U.S. 478, 483-84 (1978);

Estelle v. Williams, 425 U.S. 501, 503 (1976); Jackson v. Virginia, 443 U.S. 307 (1979);

Francis v. Franklin, 471 U.S. 307 (1985), and his right to due process, citing Yates v. Aiken,

484 U.S. 211 (1988); Sandstrom v. Montana, 442 U.S. 510 (1979); Morissette v. United

States, 342 U.S. 246 (1952); and Mullaney v. Wilbur, 421 U.S. 684 (1975); Donnelly v.

DeChristoforo, 416 U.S. 637, 643 (1974).  (Dkt. 23-2, at 50-51.)  None of the cases cited by

Young involve a "consciousness of guilt" instruction, nor has this Court uncovered any

Supreme Court decision that reaches a conclusion contrary to the decision in this case.  No

error of constitutional magnitude was committed in allowing evidence that supported the

separate consciousness of guilt charge.  The jury instruction on consciousness of guilt did

not deny petitioner his Sixth Amendment rights.

Young fails to point to specific evidence that the state courts did not take into

account, and instead argues that the trial court improperly "concluded that the statements

could be 'construed' as misleading, despite the plethora of evidence supporting the veracity

of [Petitioner's] statements."  (Id. at 52.)  Young, however, makes no specific reference to

this "plethora of evidence."  See id.  The facts presented during the course of the trial show

that Petitioner made numerous misleading statements that could be viewed as intending to deflect the investigation away from him. (See NT, 7/2/03, at 53, 59-60; NT, 6/26/03, at 94; NT, 7/1/03, at 46; NT, 6/26/03, at 93-95.)

L. FOURTEENTH AMENDMENT

Young additionally argues in each of his claims that his Fourteenth Amendment due process rights were violated as a result of the alleged Sixth Amendment violations. As there was no Sixth Amendment violation, there was no Fourteenth Amendment violation.

M. CERTIFICATE OF APPEALABILITY

"When a habeas petition is denied, Local Appellate Rule 22.2 fo the Rules of the United States Court of Appeals for the Third Circuit and 28 U.S.C. § 2253© requires the district court to make a determination of whether a certificate of appealability should issue." Johnson v. United States, No. 06-5003, 2008 WL 4831652, at *13 (E.D. Pa. Nov. 7, 2008). A habeas petitioner may only appeal a final order if a court finds that "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253©. To make the requisite showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). As reasonable jurists would not find the rulings on this habeas petition debatable, a certificate of appealability will not issue in this case.

## IV. CONCLUSION

For the reasons set forth above, Young's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 will be denied. An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States Circuit Judge
(Sitting by Designation on the District Court)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD YOUNG,                          :
                                        :
        Plaintiff                 :
                                        :     NO. 3:CV-07-016
    v.                          :
                                        :     JUDGE VANASKIE
JAMES GRACE, Superintendent             :
of SCI-Huntington, et al.,              :
                                        :
        Defendants                :

## ORDER

    **NOW, THIS 2nd DAY OF SEPTEMBER, 2010,** for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

    1.  Petitioner Richard Young's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Dkt. 1) is **DENIED**.

    2. There is no basis for the issuance of a certificate of appealability.

    3.  The Clerk of Court is directed to mark this matter **CLOSED**.


                        **s/ Thomas I. Vanaskie**
                        Thomas I. Vanaskie
                        United States Circuit Judge
                        (Sitting by Designation on the District Court)